BONNIE & COMPANY FASHIONS, INC.
and Bonnie Boerer, individually,
Plaintiffs,

v.

BANKERS TRUST COMPANY,
Defendant.

No. 91 Civ. 0341 (DNE).

United States District Court,
S.D. New York.

Nov. 20, 1996.

Budd Larner Gross Rosenbaum Greenberg & Sade (Paul A. Marber, of counsel), New York City, for plaintiffs.

Bankers Trust Company, New York City (Jack H. Weiner, of counsel), Moses & Singer, New York City (Joel David Sharrow, of counsel), Kravet & Vogel (Joseph A. Vogel, of counsel), New York City, for defendant.

## OPINION & ORDER

EDELSTEIN, District Judge.

Currently before this Court is a motion for summary judgment brought by defendant Bankers Trust Company ("BTC," "the Bank," or "defendant"). In addition, defendant and Bonnie & Company Fashions, Inc. ("Bonnie & Co." or "the Company") and Bonnie Boerer ("Boerer") ("plaintiffs") each have brought motions related to defendant's summary judgment motion. Plaintiffs have filed: (1) an affidavit, pursuant to Federal Rule of Civil Procedure ("Rule") 56(f), requesting additional time to conduct discovery; (2) a motion for leave to file additional affidavits in response to defendant's motion for summary judgment; and (3) a motion to take a second deposition of a non-party witness. Defendant has moved for a protective order staying discovery until their summary judgment motion is resolved. In addition, defendant disputes plaintiffs' request for a jury trial.

For the following reasons, defendant's summary judgment motion is granted in part and denied in part. Plaintiffs' request for additional discovery under Rule 56(f) is denied, as are their motions to file additional affidavits and to take a second deposition of a non-party witness. Defendant's motion for a protective order is dismissed as moot. This Court also finds that plaintiffs are not entitled to a jury trial.

## BACKGROUND

Because of the complexity of the factual background and the parties' competing claims in this case, this Court will discuss each individually.

## I. FACTUAL BACKGROUND

The instant case involves a commercial dispute over a factoring agreement (the "Factoring Agreement") between Bonnie & Co., signed by both its President, individual plaintiff Boerer, and BTC. (Notice of Motion for Summary Judgment, *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 91 Civ. 0341 ("Notice of Motion") at Exh. B (Apr. 8, 1994).) From 1983 to 1990, Bonnie & Co. was "a corporation dealing in the manufacture and sales of women's fashions." (Complaint and Jury Demand, *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 91 Civ. 0341 ("Complaint") ¶ 1 (Jan. 2, 1991)); (Affidavit of Bonnie Boerer in Opposition of Defendant's Motion for Summary Judgment, *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 91 Civ. 0341 ("Boerer Aff.") ¶ 10(a) (June 13, 1994)); (Affidavit of John Contrucci in Support of Defendant's Motion for Summary Judgment, *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 91 Civ. 0341 ("Contrucci Aff.") ¶ 16 (Apr. 1, 1994).) Boerer, a New Jersey citizen, founded, owned and operated Bonnie & Co., a New Jersey corporation with offices in New York and Hong Kong. (Boerer Aff. ¶¶ 7, 10(a), 39); (Complaint ¶¶ 1, 39.) Bonnie & Co.'s goods were produced in Hong Kong and China. (Complaint ¶ 12.) BTC is a New York banking corporation which "operated a division engaged in the factoring of retail accounts." *Id.* ¶¶ 2, 6.

"Factoring" is defined as "[t]he purchase of accounts receivable from a business by a factor who thereby assumes the risk of loss in return for some agreed discount." *Black's Law Dictionary* 532 (5th ed.1979). The factor purchases accounts receivable without recourse to its client if the client's customers subsequently prove unable to pay. *See Exportos Apparel Group, Ltd. v. Chemical Bank*, 593 F.Supp. 1253, 1256 (S.D.N.Y.1984). The factor undertakes a credit check of its clients' proposed customers to determine whether to accept an absolute risk of their solvency. If the factor approves the proposed customer, the factor's client may consummate the sale to the proposed customer and the factor then purchases the account receivable. In this way, the factor advances funds to its client. If a dispute arises between the factor's client and one of the client's customers over the goods or invoices, however, the factor is entitled to "charge back" to its client the full amount of the disputed accounts receivable. *See Tex Styles Group, Inc. v. Republic Factors Corp.*, 106 A.D.2d 257, 258, 482 N.Y.S.2d 24, 25 (N.Y.App.Div.1984), *aff'd*, 64 N.Y.2d 959, 477 N.E.2d 1105, 488 N.Y.S.2d 651 (1985). This is true irrespective of the merits of the dispute between the factor's client and its customer. *See Danleigh Fabrics, Inc. v. Gaynor–Stafford Indus., Inc.*, 95 A.D.2d 719, 720, 463 N.Y.S.2d 828 (N.Y.App.Div.1983), *aff'd*, 62 N.Y.2d 677, 464 N.E.2d 985, 476 N.Y.S.2d 287 (1984). In effect, the factor acts as the insurer only of its client's customers' insolvency, *Exportos Apparel*, 593 F.Supp. at 1256, not of the quality of its clients' goods.

In the case at bar, plaintiffs contend that "[i]n June 1984, [Bonnie & Co.] entered into a Factoring Agreement with BT[C] with Security Agreement and Letter Agreement." (Complaint ¶ 8.) At that time, Boerer also signed an "Unlimited Guaranty," rendering herself personally liable to BTC for all debts of Bonnie & Co. *Id.* ¶ 9; (Notice of Motion at Exh. C.) On August 7, 1987, the parties entered into a "letter of credit supplement" to the Factoring Agreement which provided that BTC "may from time to time at [Bonnie & Co.'s] request, but in [BTC's] sole discretion, cause a bank or banks or other financial institutions" to issue letters of credit to Bonnie & Co. (Affidavit of Salvatore Prizzi in Support of Defendant's Motion for Summary Judgment, *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 91 Civ. 0341 ("Prizzi Aff.") ¶ 23 (April 7, 1994).) Boerer maintains that, although she had "extensive experience in the retail, design, importing and manufacturing aspects of the women's apparel business," she possessed "minimal training and experience in the management and financial affairs of a company." (Boerer Aff. ¶¶ 10(b)–(c).) Boerer therefore claims to have relied upon BTC "for their advice and guidance with respect to all financial matters involving [her] business." *Id.* ¶ 10(c). Boerer also asserts that "[f]rom the time Bonnie & Co. entered into the Factoring Agreement,

BT[C] was its primary and only bank, factor and lender." *Id.* ¶ 10(d).

Plaintiffs claim that "[p]ursuant to the Factoring Agreement, the Company agreed that it would sell to defendant, and defendant agreed to purchase and ∴. to make advances against all accounts receivable approved by defendant arising out of the Company's sale of merchandise to those customers which defendant approved." *Id.* ¶ 13. Plaintiffs contend that "[p]ursuant to the terms of the Factoring Agreement, as to each account created by the Company with the credit approval of defendant, which approval had not been withdrawn, defendant assumed the 'Credit Risk' on every such approved account." *Id.* ¶ 15. Plaintiffs further allege that the Factoring Agreement required defendant to: (1) render a proper accounting of transactions; (2) pay Bonnie & Co. on specified dates; (3) collect receivables in a diligent manner; and (4) act in accordance with factoring industry standards. *Id.* ¶¶ 16–19.

Defendant states that, pursuant to the Factoring Agreement, Bonnie & Co. "sold and assigned to the bank various accounts receivable ... for goods consisting of ladies' clothing which were sold by [Bonnie & Co.] to others." (Prizzi Aff. ¶ 13.) Defendant maintains that, in consideration of Bonnie & Co.'s sales of accounts to defendant, from 1984–1989, "the Bank made periodic payments, loans, cash advances, and over-advances, and gave other financial accommodations to [Bonnie & Co.]." *Id.* ¶¶ 13–14.

Boerer asserts that, in fiscal year 1987, Bonnie & Co. registered gross sales of over $29,000,000 and earned a net profit of $2,900,000. (Boerer Aff. ¶ 17.) As a "Subchapter S" corporation under the Internal Revenue Code, those profits were distributed to Bonnie & Co.'s shareholders. *Id.* Boerer, as ninety-eight percent shareholder, received the lion's share of these profits, in addition to her salary. *Id.* In fiscal year 1988, Bonnie & Co.'s gross sales were approximately $33,890,000, but the Company reported a net loss of $208,567. *Id.* ¶ 18.

In May 1989, John F. Contrucci ("Contrucci"), a BTC Vice President, became concerned that BTC had a "total exposure" on the Bonnie & Co. account of approximately $3,982,000, which was above its projected exposure of $2,711,000. *Id.* ¶ 20. At that time, BTC sought an explanation from plaintiffs for the discrepancy. *Id.* ¶ 21. Boerer contends that, after consulting with plaintiffs' accountants, BTC was satisfied that Bonnie & Co.'s 1989 finances were sound, but perceived a need for an infusion of working capital into Bonnie & Co. *Id.* ¶ 22. Negotiations between BTC and plaintiffs ensued and the parties allegedly reached an agreement on May 25, 1989 ("the May 1989 agreement"). *Id.* ¶¶ 22–23. Pursuant to this agreement Boerer personally was to pledge a $1,000,000 Treasury Bill as "liquid side collateral" to BTC and BTC was to reduce Boerer's then unlimited personal guaranty to $2,000,000. *Id.*

The May 1989 agreement gives rise to two issues in this litigation. First, the parties dispute the agreement's terms concerning the timing of the termination of the Treasury Bill. Boerer claims that the parties agreed that the Treasury Bill would expire on September 15, 1989. *Id.* ¶¶ 28–29. However, Contrucci forwarded to one of Boerer's former attorneys, M. David Baker ("Baker"), a draft of a security agreement and a limited guaranty, neither of which conformed to Boerer's understanding of the May 1989 agreement. *Id.* ¶ 28. Plaintiffs contend that the draft security agreement failed to include the September 15, 1989, termination date that plaintiffs had sought, and that the $2,000,000 limited guaranty failed to state that it was secured by the $1,000,000 collateral. *Id.* On June 29th, 1989, Boerer executed "corrected" versions of both the security agreement and the limited guaranty, amending them to include the provisions plaintiffs claim were omitted. *Id.* ¶ 29, Exhs. F & G. Baker sent the corrected documents to Contrucci on July 5, 1989. *Id.* ¶ 29. Boerer asserts that BTC "did not 'accept' the corrected documents" and that the corrected documents "triggered an immediate and adverse reaction" by BTC. *Id.* ¶ 30. Boerer contends that in late July 1989, BTC informed Baker that, "unless the expiration date for the Treasury Bill was eliminated from the Security Agreement[,]" BTC would

discontinue its financial support of Bonnie & Co. *Id.* ¶ 32.

The second issue created by the May 1989 agreement concerns the significance of Boerer's $1,000,000 Treasury Bill pledge. Plaintiffs' claim that Boerer's pledge of a $1,000,000 Treasury Bill was in exchange for defendant's agreeing not to terminate its financial support of plaintiffs. *Id.* ¶ 38. According to defendant, however, "[a]fter negotiations with [plaintiffs] and [their] attorney regarding [the $1,000,000 Treasury Bill] reached an impasse, the Bank exercised its absolute right to terminate the Factoring Agreement." (Prizzi Aff. ¶ 35.) On August 2, 1989, Contrucci sent by certified mail to Bonnie & Co.'s New York City office a sixty-day notice that the Factoring Agreement would terminate on October 2, 1989. (Boerer Aff. ¶ 37.) Plaintiffs allege that this action breached the parties' May 1989 agreement. *Id.* ¶ 38. Because BTC believed Boerer to be in Hong Kong during August 1989, (Prizzi Aff. ¶ 37), BTC also sent by "open fax" a copy of its notice of termination to Bonnie & Co.'s Hong Kong office, where it was received by an employee of Bonnie & Co. (Boerer Aff. ¶ 39); (Complaint ¶ 54.) Boerer claims that, as a result of BTC's "open fax," "confidential" and "sensitive" information contained in the fax was disseminated among Bonnie & Co.'s Hong Kong employees. (Boerer Aff. ¶ 44.) She also asserts that "[r]umors" of Bonnie & Co.'s loss of financial backing circulated in Hong Kong, causing her manufacturers to discontinue their relationship with Bonnie & Co." *Id.* ¶¶ 44–50.

BTC contends that it "did not stop financially supporting [Bonnie & Co.] during the sixty days following the giving of the August 2, 1989 notice." (Contrucci Aff. ¶ 5.) BTC maintains that it advanced nearly $1,500,000 to Bonnie & Co. during this period. *Id.* Nevertheless, on October 6, 1989, the Factoring Agreement was reinstated when Boerer executed a security agreement (the "Security Agreement") which unconditionally pledged a $1,000,000 Treasury Bill without a termination date. (Contrucci Aff. ¶ 4); (Notice of Motion at Exh. A.) Also on October 6, 1989, Boerer executed a limited guaranty (the "Limited Guaranty") which rendered her personally liable for Bonnie & Co's debts to BTC up to $2,000,000. (Notice of Motion at Exh. H.) By letter dated January 2, 1990, Bonnie & Co. notified BTC that Bonnie & Co. had adopted a plan of liquidation and that it was terminating the Factoring Agreement effective sixty days thereafter. (Contrucci Aff. ¶ 16.)

On January 15, 1991, plaintiffs' commenced the instant litigation. It is notable that the facts of this case have given rise to at least two other court actions. First, in 1990, plaintiffs sued their accountants, Hertz, Herson & Co., in federal court in the District of New Jersey (the "New Jersey Action"). (Notice of Motion at Exh. 8); (Amended Complaint & Jury Demand, *Bonnie & Co. Fashions, Inc. v. Hertz, Herson & Co.*, 90–4397 at 2, 8 (Dec. 3, 1991).) Following a jury trial, a judgment of "no cause of action [was] entered in favor of ·defendants and against plaintiffs, with costs." (Prizzi Aff. ¶¶ 8, 47); (Notice of Motion at Exh. 11.) Second, defendant in the instant case alleges that plaintiffs commenced an action in New York Supreme Court "seeking minimal damages as a 'pre-emptive defensive strike' in anticipation of efforts by the bank to enforce plaintiffs' outstanding obligations." (Prizzi Aff. ¶ 9.) This Court has received no information regarding the status of that litigation.

## II. THE PARTIES' CLAIMS

Plaintiffs' Complaint contains six counts. Count One alleges that BTC willfully breached the Factoring Agreement. Plaintiffs maintain that defendant breached the Factoring Agreement with Bonnie & Co. by: (1) failing "to render proper and accurate monthly statements of account"; (2) "wrongfully and willfully deducting from the Company's Factor Balance accounts which should have been credit [sic] to the Company's Factor Balance in that the accounts factored were credit approved invoices which were deducted without just cause"; (3) "wrongfully and willfully charg[ing] back to the Company, and deduct[ing] from the Company's Factor Balance monies not paid on Credit Risk Accounts approved by defendant"; (4) creating "disputes after the date the invoices

were due"; (5) allowing "discounts to be taken by various customers long past the allotted time and terms for any such discounts" without notifying Bonnie & Co.; and (6) failing "to pay the sums now due and owing to the Company." (Complaint ¶ 20.) Plaintiffs further contend that BTC "breached its obligation of honesty in fact and observances of reasonable commercial standards of fair dealing in the trade in that it did not act in good faith to collect the open receivables of the Company in a diligent, proper and expeditious manner." *Id.* ¶ 21. Plaintiffs seek $251,200 in compensatory damages and $500,000 in punitive damages in Count One. *Id.* ¶¶ 22–23.

Count Two asserts that "[a]t all times relevant herein, defendant has acted as a fiduciary on behalf of [Bonnie & Co.] in collecting the accounts assigned to it under the factoring agreement," *id.* ¶ 25, and claims that defendant violated its fiduciary duties to plaintiff by not adhering to the terms of the Factoring Agreement. *Id.* ¶ 33. Plaintiffs seek a certified accounting from defendant of "all interest charges made within the last twelve months" as of January 2, 1991, the date the Complaint was filed. *Id.*

Count Three alleges that defendant negligently processed and collected the accounts that were the subject of the Factoring Agreement. *Id.* ¶ 39. Plaintiffs seek $127,000 in compensatory damages. *Id.* Count Four alleges that defendant has wrongfully failed to release the $1,000,000 Treasury Bill that Boerer pledged as security for Bonnie & Co.'s debts to BTC. *Id.* ¶¶ 42–46. Plaintiffs seek punitive damages of $250,000 as a result of BTC's failure to return this security. *Id.* ¶ 47.

Count Five contains several claims arising from BTC's faxing of the notice of termination of the Factoring Agreement. *Id.* ¶¶ 49–54. Within Count Five, plaintiffs set forth claims of: (1) breach of the Factoring Agreement; (2) breach of fiduciary duty; (3) negligence; (4) fraud; (5) breach of a duty of confidentiality; (6) intentional infliction of emotional distress; and (7) damages of $5,000,000 for lost profits, $2,400,000 for lost salary, and $2,000,000 for "mental anguish and emotional distress for breach of con-

tract." *Id.* ¶¶ 54–63. Count Six seeks reimbursement of $250,000 in costs that Bonnie & Co. incurred as a result of BTC's alleged breaches both of the Factoring Agreement and of its fiduciary duties. *Id.* ¶ 66.

Defendant disputes plaintiffs' claims, arguing that defendant acted properly and within the terms of the Factoring Agreement at all times relevant to the instant dispute. Defendant also has filed seven counterclaims against plaintiffs. First, BTC claims that "there exists a debit balance owing to [BTC] from [Bonnie & Co.] of $127,608.35." (Answer With Counterclaims, *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 91 Civ. 0341 ("Answer") ¶ 33 (Dec. 5, 1991).) Second, pursuant to the terms of the Factoring Agreement, BTC seeks to recover from Bonnie & Co. its attorneys' fees for collecting this debt. *Id.* ¶ 38. Third, BTC maintains that Boerer is liable for the full amount of this debt because of the Limited Guaranty that Boerer executed on October 6, 1996. *Id.* ¶¶ 39–41. Fourth BTC contends that Boerer is personally liable for BTC's attorneys' fees under the terms of the Limited Guaranty. *Id.* ¶¶ 42–43. Fifth, BTC claims to be a holder in due course of the $1,000,000 Treasury Bill and seeks: (1) a declaratory judgment that BTC has a superior interest in this collateral; (2) an order "foreclosing [BTC's] perfected security interest in the Collateral and allowing such Collateral to be seized and liquidated by [BTC] in order to satisfy [Bonnie & Co.'s] Indebtedness and/or the obligations owed by Boerer under the Guaranty;" and (3) an order allowing BTC to recover its attorneys' fees. *Id.* ¶ 47. Sixth, BTC seeks an injunction ordering Boerer to cooperate with the liquidation of the Treasury Bill. *Id.* ¶¶ 49–52. Finally, BTC contends that Boerer is liable for BTC's attorney's fees pursuant to the Security Agreement under which she pledged the $1,000,000 Treasury Bill to BTC. *Id.* ¶¶ 53–55.

Plaintiffs dispute the facts underlying defendant's counterclaims. *See generally* (Answer To Counterclaim, *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 91 Civ. 0341 ("Answer to Counterclaim" (Mar. 4, 1992).) Moreover, plaintiffs assert the following affir-

mative defenses: (1) failure to state a claim upon which relief can be granted; (2) failure of consideration; (3) estoppel; (4) laches; (5) statute of limitations; (6) breach of contract; (7) statute of frauds; (8) equitable estoppel; (9) parole evidence; (10) waiver; (11) damages were the avoidable consequence of defendant's conduct; and (12) plaintiffs violated no duty to defendant. (Affirmative Defenses to Counterclaim, *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 91 Civ. 0341 ("Affirmative Defenses to Counterclaim") ¶¶ 1–12 (Mar. 4, 1992).)

## DISCUSSION

Currently pending before this Court are four motions: (1) defendant's motion for summary judgment; (2) plaintiffs' motion to file additional affidavits in response to defendant's motion for summary judgment; (3) plaintiffs' motion to take a second deposition of a witness; and (4) defendant's motion for a protective order staying discovery. In addition, plaintiffs submitted an affidavit pursuant to Rule 56(f) opposing defendant's summary judgment motion on the grounds that, in order to substantiate their allegations, plaintiffs require the opportunity to depose certain individuals. There is also an issue regarding plaintiffs' entitlement to a jury trial. Because the resolution of plaintiffs' Rule 56(f) affidavit and their motion to file additional affidavits necessarily implicates this Court's ability to resolve defendant's motion for summary judgment, this Court will address those matters first. This Court will then address the remaining issues in turn.

As a preliminary matter, this Court notes that Section 10.1 of the Factoring Agreement provides: "This Agreement and all transactions thereunder ... shall be governed by and interpreted in accordance with the laws of" New York. (Notice of Motion at Exh. B.) "When such a provision exists and the jurisdiction chosen by the parties has a substantial relationship to the parties or their performance, New York law requires courts to honor the parties' choice insofar as matters of substance are concerned." *Woodling v. Garrett Corp.*, 813 F.2d 543, 551 (2d Cir.1987) (citing *A.S. Rampell, Inc. v. Hyster Co.*, 3 N.Y.2d 369, 381, 144 N.E.2d 371, 379,

165 N.Y.S.2d 475, 486 (1957)); *see also* Restatement (Second) of Conflict of Laws § 187 (1989). In the instant case, Bonnie & Co. maintained a New York office, (Boerer Aff. ¶¶ 7, 39), Boerer operated and owned ninety-eight percent of Bonnie & Co., *id.* ¶¶ 10(a), 17, and BTC is a New York banking corporation, (Complaint ¶ 2). This Court thus finds that each of these parties has a "substantial relationship" to New York. Accordingly, this Court finds that New York law governs the substantive matters of the instant case.

## I. PLAINTIFFS' RULE 56(f) REQUEST

Plaintiffs filed an affidavit pursuant to Rule 56(f) in opposition to defendant's motion for summary judgment. (Affidavit of Leonard A. Peduto, Jr., Pursuant to Rule 56(f) in Opposition to Defendant's Motion for Summary Judgment, *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 91 Civ. 0341 ("Rule 56(f) Aff.") ¶¶ 1–2 (June 13, 1994).) Plaintiffs contend that, in order to substantiate the allegations in their complaint and to refute BTC's counterclaims, plaintiffs "require an opportunity to depose certain persons who were employed by BT[C] when plaintiffs' claims and causes of action arose; former employees of Bonnie & Company; persons who were employed by customers of Bonnie & Company; and persons who were involved or would have been involved in the manufacturing of Bonnie & Co.'s Spring and Fall 1990 lines." *Id.* ¶ 4. In plaintiffs' Rule 56(f) Affidavit, Leonard A. Peduto, Jr. ("Peduto") states that, because his law firm "was recently substituted a [sic] Plaintiffs' counsel, [he is] unable to detail the efforts made by prior counsel to secure the deposition testimony needed to substantiate the claims in the Complaint." (Rule 56(f) Aff. ¶ 10.) "Moreover, [Peduto is] unable to inform the Court why, if former counsel attempted to take the aforementioned depositions, such efforts were unsuccessful." *Id.* It is noteworthy that Peduto has since been replaced as plaintiffs' counsel. (Stipulation and Order for Substitution of Counsel, *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 91 Civ. 0341 (Oct. 30, 1996).)

Defendant opposes plaintiffs' Rule 56(f) request for additional discovery. After it ap-

peared that the parties had filed all of their submissions concerning the instant motion for summary judgment, the Second Circuit, in *Paddington Partners v. Bouchard*, 34 F.3d 1132 (1994), upheld a district court's grant of summary judgment despite the non-movant's claim for a need for additional discovery. *Id.* at 1137–38. Although *Paddington Partners* did not alter existing Second Circuit case law concerning Rule 56(f), defendant utilized the occasion of the Second Circuit's decision as an opportunity to submit even more papers to this Court in support of its motion for summary judgment. (Supplemental Memorandum of Law of Defendant Bankers Trust Company in Further Support of Defendant's Motion for Summary Judgment, *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 91 Civ. 0341 ("BTC Supp. Memo") ¶ 1 (Oct. 28, 1994).) In these supplemental papers, defendant highlights the procedural history of this litigation to support its argument that summary judgment should proceed despite plaintiffs' Rule 56(f) request.

For example, defendant asserts that this Court twice extended plaintiffs' time to file opposition papers and to conduct a deposition relating to defendant's summary judgment motion. *Id.* at 2–3. Defendant also points out that the May 17, 1994, stipulation which extended plaintiffs' time to file opposition papers also states that discovery will be conducted "if defendant's summary judgment motion is denied," *id.* at 2 and Exh. B; (Reply Affidavit of Joel David Sharrow, *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 91 Civ. 0341 ("Sharrow Reply Aff.") at Exh. 18 (Aug. 31, 1994)), and expressly provides that this potential discovery was proposed "without prejudice to the Bank's right to [file] a motion for summary judgment and/or argue that such discovery is or is not necessary to the disposition of such motion." (BTC Supp. Memo at 4); (Sharrow Reply Aff. at Exh. 18.)

Defendant next looks to "a very important admission by Boerer" at her deposition—that, prior to the instant Rule 56(f) request, one of her previous attorneys, Anthony Mahoney ("Mahoney"), "never made any arrangement to depose anybody in regard to the Bankers Trust lawsuit." (BTC Supp.

Memo at 2–3.) Defendant also asserts that, even though this action was commenced more than three years prior to the March 5, 1994, conference at which this Court granted defendant permission to move for summary judgement, neither Mahoney nor Peduto—who were both present—raised a Rule 56(f) defense to defendant's motion for summary judgment. *Id.* at 4; (Sharrow Reply Aff. ¶¶ 45, 48.) Finally, defendant claims that plaintiffs' justification for their Rule 56(f) Affidavit—that Peduto's recent substitution as plaintiffs' counsel left him unable to know what discovery efforts his predecessor had undertaken—is legally insufficient. (BTC Supp. Memo at 6–7.)

Plaintiffs counter defendant's assertions on several fronts. First, plaintiffs claim that, because *Paddington Partners* did not change the Second Circuit's interpretation of Rule 56(f), defendant simply exploited the decision "as a vehicle to re-open the summary judgment record for purposes of rearguing matters it had fully presented in" its prior summary judgment submissions. (Supplemental Memorandum on Behalf of Plaintiffs Bonnie & Co. Fashions, Inc. and Bonnie Boerer in Further Opposition to Defendant's Motion for Summary Judgment, *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 91 Civ. 0341 ("Plaintiffs' Supp. Memo") at 3–4 (Nov. 3, 1994).) Second, plaintiffs argue that they had no obligation to "formally notify the Bank of its intention to utilize a Rule 56(f) defense prior to the filing of their opposition papers." *Id.* at 4. Third, plaintiffs assert that defendant attempted to "delay, frustrate and impede plaintiffs' legitimate attempts to obtain the testimony of several key witnesses." *Id.* at 5. Finally, plaintiffs argue that "the Bank has embellished its argument that the Peduto Affidavit falls short of the requirements of Rule 56(f)." *Id.* at 8.

Rule 56(f) provides:

Should it appear from the affidavits of a party opposing the [summary judgment] motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be

taken or discovery to be had or may make such other order as is just.

Fed.R.Civ.P. 56(f). Rule 56(f) requires courts to ensure that parties have a reasonable opportunity to make their record before ruling on a motion for summary judgment. *Sundsvallsbanken v. Fondmetal, Inc.*, 624 F.Supp. 811, 814–15 (S.D.N.Y.1985) (citation omitted). It protects a party opposing a summary judgment motion "who for valid reasons cannot by affidavit—or presumably by any other means authorized under Rule 56(e)—present 'facts essential to justify his opposition' to the motion." 10A Charles A. Wright, Arthur R. Miller, Mary Kay Kane, Federal Practice and Procedure § 2740, at 529–30 (2d ed. 1983). Rule 56(f) thus "allows a party who has no specific material contradicting his adversary's presentation to survive a summary judgment motion if he presents valid reasons justifying his failure of proof." *Id.* § 2740, at 530. Because it is a safeguard against premature grants of summary judgment, Rule 56(f) "should be applied with a spirit of liberality." *Id.* at 532 (footnote omitted).

Commentators note, however, that "the rule will not be liberally applied to aid parties who have been lazy or dilatory." *Id.* at 535. Moreover, while "Rule 56(f) discovery is specifically designed to enable a plaintiff to fill material evidentiary gaps in its case . . . it does not permit a plaintiff to engage in a 'fishing expedition.'" *Capital Imaging Assoc. v. Mohawk Valley Medical Assoc., Inc.*, 725 F.Supp. 669, 680 (N.D.N.Y.1989) (citing *Waldron v. Cities Service Co.*, 361 F.2d 671, 673 (2d Cir.1966)) (citations omitted), *aff'd*, 996 F.2d 537 (2d Cir.), *cert. denied*, 510 U.S. 947, 114 S.Ct. 388, 126 L.Ed.2d 337 (1993). "Rule 56(f) is not a shield against all summary judgment motions." *Sundsvallsbanken*, 624 F.Supp. at 815. Rather, "[l]itigants seeking relief under the rule must show that the material sought is germane . . . and that it is neither cumulative nor speculative." *Id.* (citation omitted). A party opposing summary judgment who chooses to utilize Rule 56(f) "directly and forthrightly invokes the trial court's discretion." 6 James W. Moore, Moore's Federal Practice ¶ 56.24, at 56–797 (2d Ed.1995). Accordingly, a district court's denial of a request for more time under Rule

56(f) "is subject to reversal only if it abused its discretion." *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 925 (2d Cir.1985); *see also Contemporary Mission v. United States Postal Serv.*, 648 F.2d 97, 105 (2d Cir.1981).

The Second Circuit has articulated a four-part analysis to determine whether a party's request under Rule 56(f) is appropriate. Rule 56(f) requires the opponent of a motion for summary judgment who claims to be unable to produce evidence in opposition to the motion to file an affidavit explaining:

> 1) the nature of the uncompleted discovery, i.e. what facts are sought and how they are to be obtained; *and*
>
> 2) how those facts are reasonably expected to create a genuine issue of material fact; *and*
>
> 3) what efforts the affiant has made to obtain those facts; *and*
>
> 4) why those efforts were unsuccessful.

*Burlington*, 769 F.2d at 926 (citations omitted) (emphasis added). "[T]he failure to comply with the third and fourth requirements is not automatically fatal to a Rule 56(f) affidavit." *Paddington Partners*, 34 F.3d at 1139 (internal citation omitted). However, where a party makes no reference to the third and fourth *Burlington* factors— its efforts to obtain discovery and why those efforts were unsuccessful—a Rule 56(f) request may be denied. *Id.* Conversely, where a party's Rule 56(f) affidavit fails to set forth details concerning the third and fourth factors of the test, a Rule 56(f) request may be granted if the district court finds that defendant "presumably could if so requested." *John Hancock Property & Casualty Ins. Co. v. Universale Reinsurance Co., Ltd.*, 147 F.R.D. 40, 47 n. 15 (S.D.N.Y. 1993).

In the case at bar, plaintiffs' Rule 56(f) affidavit did not simply fail to allege facts concerning the efforts that had been made to obtain discovery and why they had been unsuccessful, as required by *Burlington*. Instead, Peduto affirmatively volunteered that

> I am unable to detail the efforts made by prior counsel to secure the deposition testi-

mony needed to substantiate the claims in the Complaint. Moreover, I am unable to inform the Court why, if former counsel attempted to take the aforementioned depositions, such efforts were unsuccessful. (Rule 56(f) Aff. ¶ 10.) Thus, plaintiffs' own counsel concedes his failure to comply with the third and fourth requirements of a Rule 56(f) request under *Burlington.*

Under normal circumstances, this Court might exercise its discretion to grant plaintiffs' Rule 56(f) request despite plaintiffs' concession that they have not met all of the elements of the *Burlington* standard: plaintiffs substituted counsel rather close to the time that defendant moved for summary judgment, and it is thus understandable that Peduto, plaintiffs' substituted counsel, might not have had complete knowledge of his predecessors' discovery attempts. This Court finds, however, that the instant Rule 56(f) request does not arise under normal circumstances. On the contrary, plaintiffs' Rule 56(f) application arises as a result of plaintiffs' own inaction. For instance, in the three years that this action was pending prior to defendant's summary judgment motion, plaintiffs undertook very little discovery. (BTC Supp. Memo at 4–5.) That was their prerogative. This Court refuses to allow plaintiffs to penalize defendant for plaintiffs' choice to limit their own discovery efforts. If this Court permitted plaintiffs to stymie defendant's summary judgment motion on this ground, this Court would encourage a party that suspected that its opponent would move for summary judgment to make a Rule 56(f) request. Promoting such dilatory tactics is neither the purpose of Rule 56(f) nor the practice of this Court.

In addition, the stipulation between the parties that this Court "So Ordered" on July 5, 1994, provides that "if defendant's pending summary judgment motion is denied, in whole or in part," then each party may undertake several enumerated avenues of discovery. (Sharrow Reply Aff. at Exh. 18.) The stipulation also states that "the proposed conducting of discovery is without prejudice to the Bank's right to have filed a motion for summary judgment and/or argue that such discovery is or is not necessary to the dispo-

sition of such motion." *Id.* Plaintiffs have thus represented to this Court and have agreed with defendant that discovery would proceed only in the event that defendant's summary judgment motion is unsuccessful, and that defendant's summary judgment motion would not be prejudiced by outstanding discovery matters. This Court finds no reason why plaintiffs should not be held to the terms of their bargain, as embodied in the stipulation of July 5, 1994. *Id.* Accordingly, this Court finds that plaintiffs' Rule 56(f) request should be denied.

## II. PLAINTIFFS' MOTION FOR LEAVE TO FILE ADDITIONAL AFFIDAVITS

█ Plaintiffs seek leave of this Court to file additional affidavits in further opposition to BTC's summary judgment motion. Plaintiffs claim that BTC filed with its summary judgment reply papers "certain arguments[ ] and supporting evidence ... only after plaintiffs' right to respond had expired." (Memorandum in Support of Plaintiffs' Motion for Leave to File Reply Affidavits in Further Opposition to Defendant's Motion for Summary Judgment, *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.,* 91 Civ. 0341 ("Memo for Leave") at 2 (Feb. 24, 1995).) According to plaintiffs, defendant's reply papers contain "new evidence" to which plaintiffs are entitled to respond. *Id.* at 2–3.

First, plaintiffs' call this Court's attention to the affidavit of Kit Cheong ("Leo") Szeto ("Szeto"), the former General Manager of Bonnie & Co.'s Hong Kong affiliate. *Id.* at 2 (citing (Affidavit of Kit Cheong ("Leo") Szeto, *Bonnie & Company Fashion, Inc. v. Bankers Trust Co.,* 91 Civ. 0341 ("Szeto Aff.") (July 12, 1994).)) Plaintiffs complain that Szeto admits in his affidavit that he received the August 2, 1989, fax from BTC terminating the Factoring Agreement. (Memo for Leave at 2.) Plaintiffs also argue that Szeto's assertion that Bonnie & Co.'s garments failed laboratory tests is intended to refute plaintiffs' claim that it was the "open telefax" from BTC which led Hong Kong manufacturers to cancel their business relationships with Bonnie & Co. *Id.* at 3.

Second, plaintiffs claim that the reply affidavit of Joel David Sharrow ("Sharrow") injects new evidence and arguments into the instant case. *Id.* at 3. Plaintiffs assert that Sharrow's Reply Affidavit: (1) makes a procedural objection to plaintiffs' submission of the affidavit of plaintiffs' expert witness, Michael Loguercio, in opposition to defendant's motion for summary judgment; (2) misstates a conversation between Sharrow and plaintiffs' counsel concerning plaintiffs' intentions regarding expert witnesses; and (3) "submits portions of the deposition testimony of Nikki Cifarelli ("Cifarelli"), a former Bonnie & Co. Vice President who [sic] testimony was taken *after* the filing of plaintiffs [sic] opposition papers." (Memo for Leave at 3 (emphasis in original).) Cifarelli's testimony pertains to the allegation that BTC refused to issue letters of credit to Bonnie & Co. *Id.* at 5. Plaintiffs argue that her testimony is offered via Sharrow's Reply Affidavit "as an attempt by [BTC] to substantiate its position that it did not refuse to issue letters of credit for [Bonnie & Co.'s] Holiday 1989 clothing line." *Id.*

Defendant opposes plaintiffs' motion for leave to file additional affidavits and raises several counterarguments. First, BTC argues that the submissions offered by plaintiffs do not establish a defense to BTC's summary judgment motion. (Memorandum in Opposition to Plaintiffs' Motion for Leave to File Reply Affidavits, *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.,* 91 Civ. 0341 ("Opp. Memo") at 2 (Mar. 6, 1995).) Second, BTC claims that its reply affidavits were submitted in response to issues newly raised by plaintiffs' opposition papers, or to previously raised but newly detailed claims by plaintiffs. *Id.* at 4. Third, BTC argues that plaintiffs' proposed affidavits are intended, in part, to impeach improperly Boerer's deposition testimony. *Id.* at 5. Finally, BTC asserts that the new evidence plaintiffs seek leave to submit was, or should have been, available to them by the time the summary judgment record closed. *Id.*

 The law regarding the filing of surreply papers is clear. "Where new evidence is presented in a party's reply brief or affidavit in further support of its summary

judgment motion, the district court should permit the nonmoving party to respond to the new matters prior to the disposition of the motion." *Litton Indus. v. Lehman Bros. Kuhn Loeb Inc.,* 767 F.Supp. 1220, 1235 (S.D.N.Y.1991), *rev'd on other grounds,* 967 F.2d 742 (2d Cir.1992). However, this broad language is tempered by the principle that "reply papers may properly address new material issues raised in the opposition papers so as to avoid giving unfair advantage to the answering party." *Id.; see also Travelers Ins. Co. v. Buffalo Reinsurance Co.,* 735 F.Supp. 492, 495 (S.D.N.Y.), *vacated in part on other grounds,* 739 F.Supp. 209 (S.D.N.Y. 1990); *United States v. International Business Machs. Corp.,* 66 F.R.D. 383, 385 (S.D.N.Y.1975) (Edelstein, C.J.). Further, the argument favoring a surreply submission is less compelling where the reply brief, in responding to the opposition brief, "does not spring upon [the opposing party] new reasons for the entry of summary judgment." *Litton,* 767 F.Supp. at 1235.

Having reviewed the documents upon which plaintiffs rely in support of the instant motion, this Court finds that neither document introduces new issues or new evidence into this litigation. Szeto's affidavit, for example, pertains strictly to claims and issues contained in Count Five of plaintiffs' Complaint, and in the affidavit Boerer submitted in opposition to summary judgment. To review, Count Five alleges damages resulting from BTC's termination of the Factoring Agreement by sending a fax to Bonnie & Co.'s Hong Kong Office. In his affidavit, Szeto concedes that he received this fax. (Szeto Aff. ¶ 2.) Szeto's statements reply directly to the allegations contained in Count Five of plaintiffs' Complaint and, therefore, address issues as old as this litigation. Szeto's affidavit similarly responds to claims made by Boerer in the affidavit she submitted in opposition to summary judgment. In her affidavit, Boerer claimed that Szeto was both the recipient of the fax in question and the source of its dissemination. (Boerer Aff. ¶¶ 42–45.) Szeto's assertion in his affidavit that he was the recipient of the fax, but not the source of its dissemination, directly addresses Boerer's claims. Boerer also claimed in her affidavit that Aaron Garment

Factory, Ltd., a Hong Kong firm which produced garments for Bonnie & Co., manufactured in Spring 1990 a line that "failed to comply with the United States government's care-labelling and quality requirements." *Id.* at ¶ 48. Coincidentally, Szeto's affidavit contains the exact same information regarding the Spring 1990 line. (Szeto Aff. ¶ 4.) This Court fails to see the alleged "new" evidence or issues introduced through Szeto's affidavit. Accordingly, this Court finds that Szeto's affidavit provides no basis upon which to grant plaintiff leave to file additional affidavits.

The second allegedly new piece of evidence is Sharrow's affidavit. To reiterate, plaintiffs contend that Sharrow's affidavit: (1) makes a procedural objection to plaintiffs' submission of an expert affidavit in opposition to the motion for summary judgment; (2) misstates a conversation between Sharrow and plaintiffs' counsel concerning plaintiffs' intentions regarding expert witnesses; and (3) submits a portion of the deposition of Cifarelli which was taken after plaintiffs filed their opposition papers. (Memo for Leave at 3.)

The Court finds that Sharrow's affidavit does not set forth "new" evidence or issues justifying a surreply. Plaintiffs' first argument does not establish that defendants injected new evidence or issues. In fact, plaintiffs' claim that Sharrow's affidavit states a procedural objection to plaintiffs' submission of an expert affidavit in opposition to summary judgment inherently concedes that Sharrow's affidavit was responding to plaintiffs' opposition papers. Plaintiffs' second claim—that Sharrow's affidavit misstated plaintiffs' counsel's intentions regarding expert witnesses—simply fails to point the Court to new evidence or issues that are material to this litigation. Plaintiffs' claim that Sharrow's affidavit incorporated testimony from a deposition taken after plaintiffs submitted their reply papers is similarly unpersuasive. Sharrow's affidavit incorporates testimony from Cifarelli's deposition pertaining to BTC's alleged failure to issue letters of credit to Bonnie & Co. The extension of credit by BTC to Bonnie & Co., however, was included in Count Five of the Complaint, and therefore is not a new issue. *See generally*

(Complaint ¶¶ 48–63.) In addition, plaintiffs assert in their brief opposing summary judgment that BTC's alleged failure to issue letters of credit constitutes a new, separate cause of action. (Plaintiffs' Memo at 25–28.) This Court finds that the Cifarelli deposition therefore responds to issues in the Complaint and plaintiffs' opposition papers and does not introduce new issues into this litigation to which plaintiffs' need now respond. As a result, this Court finds that plaintiffs' motion for leave to file reply affidavits in further opposition to defendant's motion for summary judgment should be denied.

## III. SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, summary judgement is appropriate where "the pleadings, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). The movant may discharge this burden by demonstrating to the court that there is an absence of evidence to support the non-moving party's case on an issue which that party would have the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). As the Second Circuit has noted, "[i]t has long been the rule that on summary judgment the inferences to be drawn from the underlying facts contained in [the moving party's] materials must be viewed in the light most favorable to the party opposing the motion." *Lendino v. Trans Union Credit Info. Co.,* 970 F.2d 1110, 1112 (2d Cir.1992) (quotation omitted).

To defeat a motion for summary judgment, the non-moving party must do "more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Instead, the non-moving party must "set forth specific facts showing

that there is a genuine issue for trial." Fed. R.Civ.P. 56(e); *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356. If the adverse party does not respond to the motion for summary judgement, "summary judgement, if appropriate, shall be entered against the adverse party." Fed.R.Civ.P. 56(e).

In considering a motion for summary judgment, a court is not to resolve contested issues of fact, but rather, it is to determine the existence of any disputed issues of material fact. *Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). The existence of a genuine issue of material fact depends on both the genuineness and the materiality of the issues raised by the motion. *See Scottish Air Int'l, Inc v. British Caledonian Group*, 867 F.Supp. 262, 266 (S.D.N.Y.1994), *aff'd*, 81 F.3d 1224 (2d Cir.1996). Indeed, "the mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985) (per curiam). To evaluate a fact's materiality, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). While "disputes over facts that might affect the outcome of a suit under the governing law will properly preclude the entry of summary judgment[,] [f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citations omitted); *see Knight*, 804 F.2d at 11–12. According to the Supreme Court, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a judge or jury to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510 (quotation omitted).

Defendant moves for summary judgment on each Count of plaintiffs' Complaint and on each of defendant's affirmative defenses and counterclaims. This Court will address the parties' competing claims regarding each issue in turn.

### A. Defendant's Motion For Summary Judgment On Plaintiffs' Complaint

In their Complaint, plaintiffs enumerate six separate counts. This Court will resolve each individually.

### 1. Count One: Plaintiffs' Claim for Breach of Contract

Count One of plaintiffs' Complaint alleges that defendant violated the terms of the Factoring Agreement, and seeks $251,200 in compensatory damages and $500,000 in punitive damages. (Complaint ¶¶ 22–23.) Plaintiffs claim that BTC violated the Factoring Agreement by, *inter alia*, failing to render accurate monthly statements, wrongfully deducting from and charging back to plaintiffs' accounts, and failing to collect in good faith Bonnie & Co.'s open accounts receivable. *Id.* at ¶¶ 20–21.

In its motion for summary judgment, defendant argues at length that all of its allegedly wrongful conduct was authorized by the Factoring Agreement. (Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment, *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 91 Civ. 0341 ("BTC Memo") at 3–16 (April 8, 1994).) In addition, BTC provides this Court with substantial evidence in support of its contentions. *See generally* (Prizzi Aff.); (Contrucci Aff.) Defendant further contends that plaintiffs are not entitled to punitive damages on their breach of contract claim. (BTC Memo at 15.)

Plaintiffs counter that they have alleged and presented evidence that BTC breached specific provisions of the Factoring Agreement. (Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment and Other Relief, *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 91 Civ. 0341, ("Plaintiffs' Memo") at 5–6, 10–11 (June 13, 1994).) Plaintiffs cite specific financial transactions between Bonnie & Co. and BTC, and allege that BTC acted improperly and in contravention of the Factoring Agreement in undertaking these transactions. *Id.* at 8–11. In support of these claims, plaintiffs submitted substantial evidence to this Court. *See generally* (Boerer

Aff.); (Affidavit of Michael Loguercio in Opposition of Defendant's Motion for Summary Judgment, *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 91 Civ. 0341 ("Loguercio Aff.") (June 9, 1994).)

■ The essential elements of an action for breach of contract under New York law are: (1) formation of a contract between the parties; (2) performance by plaintiff; (3) non-performance by defendant; and (4) resulting damages to plaintiff. *Litton*, 767 F.Supp. at 1227 (applying New York law) (citations omitted); *see also Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 31 (2d Cir.1996); *Coastal Aviation, Inc. v. Commander Aircraft Co.*, 937 F.Supp. 1051, 1060–61 (S.D.N.Y.1996).

In the case at bar, neither side disputes the existence of the Factoring Agreement. However, the parties dispute the existence of the remaining elements of plaintiffs' contract claim. For example, Section 5.1 of the Factoring Agreement expressly permits BTC to "charge back" to Bonnie & Co. the full amount of any unpaid account receivable sold to BTC, so long as the customer's refusal to pay was not due solely to its financial inability. (Notice of Motion at Exh. B.) Boerer alleges that, "[t]o reduce its liability to Bonnie & Company, BT[C] took improper chargebacks against the Factor Account for invoices to customers, even though no 'dispute' or 'offset' existed." (Boerer Aff. ¶ 8.) According to Boerer, this practice was especially prevalent with respect to customers like the stores in the Federated/Allied chains which were known to be on the brink of bankruptcy." *Id.* In other words, Boerer alleges that BTC charged back to Bonnie & Co. accounts receivable that had gone unpaid solely due to the customers' inability to pay, in derogation of the Factoring Agreement. Defendant counters that, without exception, it abided by the terms of the Factoring Agreement and did not improperly charge back to Bonnie & Co. (Prizzi Aff. ¶ 21.) BTC provides facts that allegedly establish the propriety of its conduct, including that directed specifically toward the Federated/Allied transactions. (Contrucci Aff. ¶¶ 12–15.) Accordingly, this Court finds a disputed issue of material fact exists concerning whether defendant breached the Factoring Agreement, and that, consequently, summary judgment is not appropriate on plaintiffs' breach of contract claim.

This Court cites the allegedly improper chargebacks as evidence of the existence of a disputed issue of material fact that renders summary judgment inappropriate in the instant case. This Court notes, however, that these chargebacks represent only one of several factual issues underlying plaintiffs' breach of contract claim. Because the chargeback issue alone undermines defendant's motion for summary judgment on Count One, this Court finds no need to scrutinize the remainder of the parties' respective assertions to determine whether they contain additional factual disputes. This Court thus cautions the parties against attributing any additional significance to this Court's discussion of the chargeback issue.

■ Although summary judgment is improper on plaintiffs' breach of contract claim, this Court finds that defendant is entitled to summary judgment on plaintiffs' claims for punitive damages arising from BTC's alleged breach of contract. Even if it is eventually adjudged that a breach of contract occurred, punitive damages are an inappropriate remedy for this case. Punitive damages may be recovered on a contract claim in only limited circumstances. They are available in "those instances where it is 'necessary to vindicate a public right,'" *Bibeau v. Ward*, —— A.D.2d ——, 645 N.Y.S.2d 107, 110 (N.Y.App.Div.1996) (quoting *New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 315, 662 N.E.2d 763, 767, 639 N.Y.S.2d 283, 287 (1995)), or where a defendant has engaged in conduct that can be characterized as "gross" and "morally reprehensible," or of "such wanton dishonesty as to imply a criminal indifference to civil obligations." *New York Univ.*, 87 N.Y.2d at 315–16, 662 N.E.2d 763, 639 N.Y.S.2d 283 (internal quotations omitted).

The alleged breach of contract in the instant case falls into neither of these categories. This case involves private parties quarreling over a commercial contract. No more public interest is involved here than in any litigation in which private parties call upon

the courts to resolve a dispute between them. Moreover, plaintiffs simply do not allege that BTC engaged in "gross", "morally reprehensive" or wantonly dishonest conduct deserving of punitive damages. Accordingly, this Court finds that defendant's motion for summary judgment on plaintiffs' claim for punitive damages should be granted.

### 2. Count Two: Plaintiffs' Claim for an Accounting

■ Count Two of plaintiffs' Complaint seeks an accounting from BTC on grounds that "[a]t all times relevant herein, defendant has acted as a fiduciary on behalf of [Bonnie & Co.] in collecting the accounts assigned to it under the Factoring Agreement." (Complaint ¶ 25.) BTC asserts that because the right to an accounting is premised on fiduciary duties, and because BTC had no fiduciary duty to plaintiffs, plaintiffs are not entitled to an accounting as a matter of law. (BTC Memo at 17.) Plaintiffs counter that BTC and plaintiffs had a close relationship that transcended the typical relationship between creditor and debtor, and that this close relationship gave rise to fiduciary duties. (Plaintiffs' Memo at 28.)

■ The law in New York is well settled that the "usual relationship of bank and customer is that of debtor and creditor," rather than that of fiduciaries. *Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 318 (2d Cir.1993) (quoting *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A.*, 731 F.2d 112, 122 (2d Cir.1984), *motion to vacate denied*, 11 F.3d 381 (2d Cir.1993)); *see also Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 158 (2d Cir.1995); *Resnick v. Resnick*, 722 F.Supp. 27, 39 (S.D.N.Y.1989). This is particularly true where the relationship of bank to customer is that of a factor. As Judge Haight observed in *Exportos Apparel Group, Ltd. v. Chemical Bank*, 593 F.Supp. 1253 (S.D.N.Y.1984):

> [T]he factor is [acting] solely for its own benefit; the factor is not undertaking, explicitly or by fair implication, to benefit its client in the conduct of the latter's business affairs; and in the absence of such duty or undertaking, the client ... can derive no legal rights or benefits from what the factor does or does not do.

*Id.* at 1256.

■ Moreover, in the absence of an express contractual obligation to the contrary, courts refrain from imposing extra-contractual duties on banks. *See Banco Espanol de Credito v. Security Pacific Nat'l Bank*, 763 F.Supp. 36, 45 (S.D.N.Y.1991), *aff'd*, 973 F.2d 51 (2d Cir.1992), *cert. denied*, 509 U.S. 903, 113 S.Ct. 2992, 125 L.Ed.2d 687 (1993). In "unusual circumstances" a fiduciary relationship may arise between a bank and a customer "if there is either a confidence reposed which invests the person trusted with an advantage in treating with the person so confiding or an assumption of control and responsibility." *Manufacturers Hanover*, 7 F.3d at 318 (internal quotations omitted). According to the Second Circuit, however, the "mere fact that a corporation borrowed money from the same bank for several years is insufficient to transform the relationship into one in which the bank is a fiduciary." *Id.* (citing *Aaron Ferer & Sons*, 731 F.2d at 122).

This Court finds that the evidence submitted in the instant case demonstrates that the relationship between plaintiff and BTC was that of a debtor and a creditor. The basis of their relationship, as between factors and their clients generally; *see Tex Styles Group*, 106 A.D.2d at 258, 482 N.Y.S.2d at 24, was the extension of credit through purchasing accounts receivable. Plaintiffs place much emphasis on the "six year relationship" between Bonnie & Co. and BTC, and stress that BTC "was the Company's sole factor and its only source of credit." (Plaintiffs' Memo at 29.) In addition, plaintiff Boerer contends that she "grew to rely on and [to] trust the bank's advice" and that BTC became "empowered ... with a substantial element of control over the Company." *Id.* Tellingly, however, none of the submissions to this Court allege that a fiduciary relationship was embodied in an agreement between the parties. Absent such provision, this Court will not impose on BTC a fiduciary obligation not inherent to factoring relationships.

Moreover, plaintiffs cite no case in which a court has found that a fiduciary duty arose from a debtor-creditor relationship, absent a contractual provision to that effect. Plaintiffs curiously rely heavily upon cases in which courts found that banks owed *no* duty not expressly included in a contract. *See, e.g., Resnick,* 722 F.Supp. at 39 (no fiduciary duty owed to a corporation by bank despite long-term factoring relationship); *Luxonomy Cars, Inc. v. Citibank, N.A.,* 65 A.D.2d 549, 550, 408 N.Y.S.2d 951, 954 (N.Y.App.Div. 1978) (no implied duty owed to debtor from bank). Plaintiffs also look for support to cases which are wholly irrelevant to the instant case. For instance, several of plaintiffs' cited cases do not even involve parties between whom a debtor-creditor relationship was alleged to exist. *See, e.g., Litton,* 767 F.Supp. at 1233 (investment bank soliciting potential client); *Albemarle Theatre, Inc. v. Bayberry Realty Corp.,* 27 A.D.2d 172, 277 N.Y.S.2d 505 (N.Y.App.Div.1967) (lessor-lessee relationship); *Apple Records, Inc. v. Capitol Records, Inc.,* 137 A.D.2d 50, 57, 529 N.Y.S.2d 279, 283 (N.Y.App.Div.1988) (litigation over distribution agreement between corporations).

This Court thus finds that defendant is entitled to summary judgment on Count Two of plaintiffs' Complaint. It is undisputed that none of the parties' agreements contains an express provision making BTC plaintiffs' fiduciary. It is further clear that, under New York law, the parties' alleged close, long-term affiliation does not transform their relationship from that of a debtor-creditor into one in which BTC became plaintiffs' fiduciary. Accordingly, this Court finds that there is no disputed issue of material fact regarding the parties' relationship, and that the evidence before this Court demonstrates that plaintiffs' claim for an accounting is both factually and legally deficient. Consequently, this Court finds that defendant's motion for summary judgment on Count Two should be granted.

*3. Count Three: Plaintiffs' Claim of Negligence*

■■■ Count Three of plaintiffs' Complaint alleges that defendant negligently main-tained, processed and collected the accounts that were the subject of the Factoring Agreement. (Complaint ¶ 38.) Defendant contends that it is entitled to a judgment as a matter of law on this count because a factor owes no implied duty of care to its factored clients. (BTC Memo at 9–13.) Plaintiffs counter that "New York recognizes that tort liability can arise out of a contractual relationship, especially when the parties have maintained a confidential association." (Plaintiffs' Memo at 36.)

■■■ The law is clear regarding the duty owed by a factor to its client. By purchasing accounts receivable from a client, a factor becomes "in practical effect, an insurer of the customer's solvency." *Exportos Apparel Group,* 593 F.Supp. at 1256. Any credit checks conducted by a factor into the credit of a proposed customer "is solely for [the factor's] own benefit; the factor is not undertaking, explicitly or by fair implication, to benefit its client in the conduct of the latter's business affairs; and in the absence of such duty or undertaking, the client ... can derive no legal rights or benefits from what the factor does or does not do." *Id.*

■■■ In order to state a claim for negligence, a plaintiff must allege that defendant owed plaintiff a cognizable duty of care, that the defendant breached that duty, and that the plaintiff was injured as a proximate result of the breach. *Donohue v. Copiague Union Free School Dist.,* 64 A.D.2d 29, 32, 407 N.Y.S.2d 874, 877 (N.Y.App.Div.1978), *aff'd,* 47 N.Y.2d 440, 391 N.E.2d 1352, 418 N.Y.S.2d 375 (1979); *see also State Bank of India v. Walter E. Heller & Co., Inc.,* 655 F.Supp. 326, 332 (S.D.N.Y.1987). A defendant who owes plaintiff no duty cannot be liable to that plaintiff, even if defendant is negligent. *Livingston v. Gribetz,* 549 F.Supp. 238, 242 (S.D.N.Y.1982).

As previously stated, a court faced with a motion for summary judgment must determine the existence of any contested issues of material fact, *Knight,* 804 F.2d at 11, based on the underlying "substantive law's identification of which facts are critical and which facts are irrelevant," *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2505. Under the substantive law of negligence applicable to the in-

stant motion, it is clear that there are no contested issues of material fact relevant to this Court's resolution of Count Three. Defendant, as factor, owed plaintiffs no duty of care. *See Exportos Apparel Group*, 593 F.Supp. at 1255–56. Without such duty, plaintiffs cannot satisfy the elements necessary to state a claim of negligence under New York law. *Livingston*, 549 F.Supp. at 242; *see Donohue*, 64 A.D.2d at 32, 407 N.Y.S.2d at 877. Accordingly, this Court finds that plaintiffs' negligence claim is meritless and that defendant's motion for summary judgment on this issue should be granted.

*4. Count Four: Plaintiffs' Claim that BTC Wrongfully Failed To Release Plaintiffs' Collateral*

Count Four of plaintiffs' Complaint alleges that defendant wrongfully failed to release the $1,000,000 Treasury Bill that Boerer pledged under the Security Agreement to secure Bonnie & Co.'s obligations under the Factoring Agreement. (Complaint ¶¶ 42–46.) Plaintiffs further allege that defendant's "failure to release the excess portion of the Treasury Bill is solely due to defendant's attempt to put pressure on Boerer and to force her to accept defendant's wrongful charge backs alluded to in the First Count." *Id.* ¶ 45. Plaintiffs demand the immediate return of this collateral "less the maximum sum defendant could possibly be jeopardized through any obligation of [Bonnie & Co.] to the defendant," or approximately $900,000. *Id.* ¶¶ 42–43. Plaintiffs also claim to have "sustained damages in a sum which has yet to be calculated but which will be established at trial" and seek $250,000 in punitive damages. *Id.* ¶¶ 46–47.

BTC counters that the relief sought by plaintiffs in this count is "subsumed and superseded by [BTC's] seventh counterclaim." (BTC Memo at 18–19.) BTC also argues that "[t]o the extent that the Fourth Count also contains a 'duress' claim, that claim was impliedly rejected by this Court in its March 6, 1992 decision." *Id.* at 19. In addition, BTC counters plaintiffs' "duress" claim by arguing that both BTC and Boerer acted in their self-interest by entering the Security Agreement: BTC obtained $1,000,000 collat-

eral while Boerer received BTC's continuing financial support and a reduction in personal liability to $2,000,000 under the Limited Guaranty. *Id.*

The issue of the release of a portion of the $1,000,000 Treasury Bill previously was before this Court on a motion for summary judgment brought by plaintiffs in 1992. (Order, *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 91 Civ. 0341 (Mar. 6, 1992) ("Mar. 6 Order").) In denying summary judgment, this Court noted that "[d]efendant has an undisputed security interest in the collateral at issue here." *Id.* This Court further noted that releasing a portion of the collateral without payment of the debt for which it was pledged would be a violation of Article 9 of the New York Commercial Code. *Id.* Moreover, it remains as true now as it did then that "the amount of collateral necessary to secure defendant's security as this litigation continues is a genuine issue of material fact," *id.*, because plaintiffs claim that they are owed $221,200 by BTC for BTC's alleged breaches of the Factoring Agreement, (Complaint ¶ 22), while BTC claims it is owed $127,608.35 plus interests by plaintiffs for debts arising under the Factoring Agreement, (Answer ¶ 33). Although this material factual dispute itself provides sufficient basis for this Court to find that defendant's motion for summary judgment on Count Four should be denied, this Court briefly will address BTC's arguments.

First, this Court finds that defendant is mistaken in arguing that its "seventh counterclaim" subsumes and supersedes Count Four. BTC's "Eleventh Affirmative Defense and Seventh Counterclaim" seeks costs and attorneys' fees from Boerer. *Id.* ¶¶ 53–55. This Court fails to see how this counterclaim "subsumes and supersedes" Count Four, which relates to the release of plaintiffs' collateral. Second, this Court finds that defendant's assertion that this Court's March 6, 1992, decision "impliedly rejected" plaintiffs' so-called "duress" claim in Count Four is also incorrect. In its March 6, 1992, decision, this Court relied exclusively on three grounds to justify its ruling: (1) that BTC has an undisputed security interest in the collateral; (2) that Article 9 of the New York Code prohib-

its the redemption of collateral before the debt for which it is pledged is paid; and (3) the amount of collateral needed to secure BTC's interest was (and still is) a contested issue of material fact. (Mar. 6 Order.) Contrary to BTC's argument, the March 6, 1992, decision contained no opinion, express or implied, regarding plaintiffs' duress claim in Count Four. Third, BTC's contention that no duress existed because both parties acted in their self-interest when Boerer pledged $1,000,000 as collateral is wholly inapposite. Count Four alleges that BTC sought to "put pressure on Boerer" to accept BTC's allegedly improper chargebacks. (Complaint ¶ 46.) BTC's argument is not responsive to whether duress existed due to their failure to return a portion of the $1,000,000 collateral.

 In addition, this Court finds that plaintiffs have established no basis for their claim for punitive damages in Count Four. At bottom, plaintiffs' allegation that defendant wrongfully withheld the Treasury Bill is a claim that defendant breached the Security Agreement, and thus, is a contract claim. As discussed above, punitive damages are an appropriate remedy in a breach of contract action only where they are necessary to "vindicate a public right," *Bibeau,* —— A.D.2d at ——, 645 N.Y.S.2d at 110, or where a defendant has engaged in "such wanton dishonesty as to imply a criminal indifference to civil obligations." *New York Univ.,* 87 N.Y.2d at 315–16, 662 N.E.2d 763, 639 N.Y.S.2d 283. Plaintiffs have not alleged that defendant's failure to release the Treasury Bill either is necessary to vindicate a public right or rises to a level of reprehensible behavior that merits punitive damages.

As a result, this Court finds that BTC's motion for summary judgment should be denied as to the portions of Count Four in which plaintiff seeks: (1) the release of the $1,000,000 Treasury Bill; and (2) compensatory damages resulting from defendant's allegedly wrongful failure to release the Treasury Bill. This Court also finds that BTC's motion for summary judgment should be granted on plaintiffs' Count Four claim for punitive damages.

### 5. Count Five: The "Open Fax" to Hong Kong

Count Five unleashes a blitz of claims arising from the August 2, 1989, "open fax" from BTC to Bonnie & Co.'s Hong Kong office that notified plaintiffs of the termination of the Factoring Agreement. (Complaint ¶¶ 48–63.) The Complaint does not clearly plead all of the claims for which plaintiff apparently seeks redress. Instead, various claims—this Court counts seven in all—are scattered throughout Count Five. Although dismayed by the quality of plaintiffs' pleadings, this Court has deciphered Count Five in the light most favorable to plaintiffs, and will consider each claim individually.

Plaintiffs' first claim stemming from this event is that BTC's notice of termination was faxed "in complete disregard of the factoring agreement." *Id.* ¶ 54. While not further explained in the Complaint, plaintiffs argue in their opposition submissions that BTC violated the terms of the Factoring Agreement which call for "such notice to be sent via certified mail, return receipt requested." (Plaintiffs' Memo at 19.) Plaintiffs' second claim within Count Five alleges that BTC's actions violated BTC's fiduciary duties to plaintiffs. (Complaint ¶ 60.) Plaintiffs' third claim alleges that BTC was negligent in failing "to disclose to plaintiffs that it could or would decide unilaterally, at its sole discretion, to withdraw completely the factoring and credit line extended to the plaintiff corporation." *Id.* ¶ 61. Plaintiffs' fourth claim asserts that BTC "knew or should have known that the information [and] representations given to the plaintiff were false and misleading" and that BTC "intended that the plaintiff[s] would act upon false and misleading information and representation[s]." *Id.* ¶ 62. Plaintiffs' fifth claim (which is not pleaded in the Complaint but rather is included in plaintiffs' opposition papers) asserts that defendant violated a duty of confidentiality to plaintiffs. (Plaintiffs' Memo at 38.) Plaintiffs' sixth claim alleges the tort of intentional infliction of emotional distress. (Complaint ¶ 63.) Finally, plaintiffs' seventh claim seeks $5,000,000 in lost profits, $2,400,000 in lost salary for Boerer, and $2,000,000

"for mental anguish and emotional distress for breach of contract." *Id.*

Defendant offers a similar barrage of arguments in opposition to plaintiffs' claims. Defendant first argues that, because the Factoring Agreement expressly permits either party to unilaterally terminate the Factoring Agreement on sixty days notice, defendant "cannot be liable for doing precisely what the Factoring Agreement authorized [it] to do." (BTC Memo at 24.) Defendant also argues that on August 2, 1989, it sent the notice of termination by certified mail to Bonnie & Co.'s offices in New York City. (BTC Memo at 28); (Prizzi Aff. at Exh. G.) BTC contends that because Boerer was then on a trip to Hong Kong, it sent a copy of the notice and an accompanying cover letter by fax to Hong Kong. (BTC Memo at 28–29); (Prizzi Aff. ¶ 37 & Exh. F.) BTC asserts that the terms of the Factoring Agreement did not prohibit it from faxing the notice of termination to Bonnie & Co.'s Hong Kong office and that since BTC knew that Boerer was "on an extended visit to Hong Kong, it was eminently reasonable, appropriate, and responsible on the part of [BTC], and in plaintiffs' best interests, that plaintiffs receive notice of termination as promptly as possible." (BTC Memo at 29.)

Next, defendant argues that the Factoring Agreement's provision requiring that any modification of the Factoring Agreement be in writing and signed by the parties defeats plaintiffs' claim that the parties' rights of unilateral termination were modified, in the absence of proof of such a writing. *Id.* at 26. Defendant also states that plaintiffs' claim that defendant agreed not to enforce its right to terminate the Factoring Agreement is contrary to public policy, because public policy prohibits the enforcement of a bank's promise that it will not enforce an agreement according to its terms. *Id.* at 27. Defendant also argues that, in light of the contractual provisions permitting unilateral termination and barring modification without a signed writing, plaintiffs could not reasonably have relied upon any oral representation that the bank could not terminate the agreement. *Id.* at 28.

In addition, defendant asserts that "the notice was content neutral, merely advising of the termination in 60 days in accordance with the provisions of the Factoring Agreement. The accompanying letter honestly stated why the bank elected to act in its own self-interests." *Id.* Defendant thus claims that it owed no duty of confidentiality to plaintiffs. (Defendant's Reply Memorandum of Law in Support of its Motion for Summary Judgment, *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 91 Civ. 0341 ("BTC Reply Memo") at 20–21 (Sept. 1, 1994).) BTC also maintains that none of its conduct was sufficiently outrageous to sustain a claim of intentional infliction of emotional distress. (BTC Memo at 33.)

Finally, defendant opposes plaintiffs' damages claim in Count Five on grounds that: (1) there was no breach of the Factoring Agreement; (2) future or lost profits are not compensable in a breach of contract action unless it can be proved, *inter alia*, "that such damages were in contemplation of the parties when the contract was made"; (3) as a matter of law, Boerer is not entitled to damages for emotional distress and mental anguish arising out of the alleged breach of the Factoring Agreement or in tort; (4) plaintiffs are collaterally estopped, due to plaintiffs' admissions in the New Jersey Action, that Bonnie & Co. went out of business for reasons unrelated to BTC; and (5) plaintiffs waived, as a matter of law, any claims which they did not raise regarding the Factoring Agreement prior to reinstating the Factoring Agreement on October 6, 1989. *Id.* at 31–35.

Having set forth the parties' respective arguments, this Court will discuss each of plaintiffs' claims in Count Five individually.

*a. Claim 1: Breach of Factoring Agreement*

Plaintiffs' first claim in Count Five is that BTC violated the Factoring Agreement by faxing the notice of termination to Hong Kong. Section Nine of the Factoring Agreement ("Section Nine") states: "This agreement . . . shall continue in full force and effect until terminated by either of us giving to the other at least sixty (60) days prior written notice by registered or certified

mail." (Notice of Motion at Exh. B.) The letter which constituted the controversial fax was dated August 2, 1989, was sent the same day, and expressly gave plaintiffs sixty days notice of termination, stating that "effective October 2, 1989, the [Factoring] Agreement is terminated." (Boerer Aff. at Exh. K.) Plaintiffs concede that BTC noticed termination of the Factoring Agreement in accordance with Section Nine by mailing the "[t]ermination [n]otice and explanatory letter ... by certified mail, return receipt requested, addressed to [Boerer] at the offices of Bonnie & Company:" *Id.* ¶ 37. Plaintiffs claim, however, that by also faxing the termination notice, BTC violated Section Nine. (Plaintiffs' Memo at 19.)

BTC counters that because it had an absolute right to terminate the Factoring Agreement on sixty days notice, it cannot be held liable for doing so. (BTC Memo at 24.) Additionally, defendant claims that the Factoring Agreement did not prohibit it from faxing the notice of termination. *Id.* at 29. Moreover, defendant maintains that, because at the time defendant decided to issue notice of the termination it knew Boerer was travelling in Hong Kong, defendant acted reasonably in also faxing the notice to Bonnie & Co.'s offices there. *Id.* The parties' dispute regarding the fax thus turns upon whether Section Nine of the Factoring Agreement authorized BTC to fax the notice of termination in addition to sending it via certified mail.

■■■ The Second Circuit's standards for considering a summary judgment motion in a contract dispute are firmly established. "[I]n a contract dispute, summary judgment may be granted only where the language of the contract is unambiguous." *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1192 (2d Cir.1996) (citation omitted). Under New York law, whether a written contract is unambiguous is a question of law for the trial court whose determinations will be reviewed *de novo.*" *Id.* (citing *W.W.W. Assoc., Inc. v. Giancontieri*, 77 N.Y.2d 157, 163, 566 N.E.2d 639, 565 N.Y.S.2d 440 (1990)). Contract terms are ambiguous if they are

capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

*Nowak*, 81 F.3d at 1192 (citation omitted). Conversely, "no ambiguity exists when contract language has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference in opinion.'" *Sayers v. Rochester Tel. Corp. Supplemental Mgt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) (quoting *Breed v. Ins. Co. of North America*, 46 N.Y.2d 351, 355, 385 N.E.2d 1280, 413 N.Y.S.2d 352 (1978)).

■■■ Even when parties dispute the meaning of specific contract clauses, a Court's task is "to determine whether such clauses are ambiguous when 'read in the context of the entire agreement.'" *Sayers*, 7 F.3d at 1095 (quoting *W.W.W. Assocs.*, 77 N.Y.2d at 163, 566 N.E.2d 639, 565 N.Y.S.2d 440); *see also Williams Press, Inc. v. New York*, 37 N.Y.2d 434, 440, 335 N.E.2d 299, 373 N.Y.S.2d 72 (1975). By examining the entire contract, courts "safeguard against adopting an interpretation that would render any individual provision superfluous." *Sayers*, 7 F.3d at 1095 (citing *Two Guys from Harrison–N.Y., Inc. v. S.F.R. Realty Assocs.*, 63 N.Y.2d 396, 403, 472 N.E.2d 315, 482 N.Y.S.2d 465 (1984); *see also Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir.1985); *Muzak Corp. v. Hotel Taft Corp.*, 1 N.Y.2d 42, 46, 133 N.E.2d 688, 150 N.Y.S.2d 171 (1956). However, "[p]arties to a contract may not create an ambiguity merely by urging conflicting interpretations of their agreement." *Sayers*, 7 F.3d at 1095 (citations omitted).

■■■ In the instant claim, it is clear that Section Nine of the Factoring Agreement required each party to send its sixty day notice of termination by registered or certified mail. However, it is unclear whether this provision was intended by the parties to direct the exclusive means of transmitting a

notice of termination, or if the parties were bound to use registered or certified mail, but free to use other means as well. This Court therefore finds that Section Nine is not "unambiguous" because it is plainly susceptible to more than one interpretation. Which of these conflicting interpretations is correct will determine whether BTC breached the Factoring Agreement by faxing its notice of termination in addition to sending it by certified mail. Because this Court finds that the ambiguity of Section Nine creates a disputed issue of material fact, summary judgment on this claim should be denied.

### b. Claim 2: Breach of Fiduciary Duty

Plaintiffs' second claim in Count Five is that BTC "violated its fiduciary duty to the plaintiff [sic], all to the plaintiff's [sic] general damage." (Complaint ¶ 60.) In Count Two, this Court carefully analyzed and rejected plaintiffs' claim that a fiduciary relationship existed between plaintiffs and BTC. The instant claim also hinges upon this Court's finding that a fiduciary relationship existed between these parties. For the reasons stated earlier regarding Count Two, this Court finds that no fiduciary relationship existed between plaintiffs and BTC. Accordingly, this Court finds that summary judgment should be granted to BTC on plaintiffs' claim that BTC violated its fiduciary duty to plaintiffs.

### c. Claim 3: Negligence

■ Plaintiffs' third claim in Count Five asserts that BTC "failed to use reasonable care to disclose to the plaintiff that it could or would decide unilaterally, at its sole discretion and option, to withdraw completely the factoring and credit line extended to the plaintiff corporation." (Complaint ¶ 61.) In its motion for summary judgment, defendant argues that the Factoring Agreement expressly permits unilateral termination by either party. (BTC Memo. at 25–26.) Defendant similarly asserts that its letter of credit supplement to the Factoring Agreement, (Notice of Motion at Exh. 20), also expressly permits BTC to issue letters of credit in its "sole discretion." (Prizzi Aff. ¶ 23.) Consequently, defendant argues that there can be

no cause of action based on its failure to inform plaintiffs of its contractual rights. *Id.* In its submissions opposing summary judgment, plaintiffs failed to respond to any of defendant's arguments on this point.

In New York, to state a claim for negligence, a plaintiff must allege that defendant owed plaintiff a cognizable duty of care, that the defendant breached that duty, and that the plaintiff was injured as a proximate result of the breach. *Donohue,* 64 A.D.2d at 32, 407 N.Y.S.2d 874; *see also State Bank of India,* 655 F.Supp. at 332.

If a party moving for summary judgment satisfies its burden of establishing the absence of a genuine question of material fact on an issue, the burden shifts to the nonmoving party to present specific facts that demonstrate a genuine issue for trial. Fed. R.Civ. p. 56(e); *see also Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. In the instant case, defendant has established that both the Factoring Agreement and the letter of credit agreement, by their express provisions, permitted defendant to unilaterally terminate them. Plaintiff has presented no evidence disputing defendant's proof. Moreover, plaintiffs have not pointed this Court to proof of any element of negligence, other than its conclusory statement that BTC failed to use reasonable care in not advising plaintiff of the contracts' terms. As a result, this Court finds that plaintiffs have failed to carry their summary judgment burden, and that summary judgment should be granted to defendant on this claim.

### d. Claim 4: Fraud

■ Plaintiffs's fourth claim in Count Five alleges that defendant "knew or should have known that the information [and] representations given to the plaintiff[s] were material and that they were false and misleading. Defendant intended that the plaintiff[s] would act upon false and misleading information and misrepresentation[s]." (Complaint ¶ 62.) Plaintiffs' Complaint does not clearly define the "information" and "misrepresentations" at the core of this claim. Instead, plaintiffs refer to the May 25, 1989, agreement in which Boerer claims she pledged to BTC a $1,000,000 Treasury Bill in return for

BTC maintaining its financial support of Bonnie & Co. Buried in an affidavit, plaintiffs allege that

> BT[C]'s termination of the Factoring Agreement is imbued with bad faith. BT[C] may have had the power to terminate its relationship with Bonnie & Co. under the terms of the Factoring Agreement. What BT[C] did not have was any right to obtain a pledge of the [$1,000,000] liquid-side collateral it had requested in order to continue its support of the programs of Bonnie & Company, to thereafter disavow the fair and reasonable agreement made by its authorized officers for purposes of accommodating the interest of all parties and then to terminate the ongoing financial support it had promised to Bonnie & Company in consideration of the collateral pledge. In doing so, BT[C] violated the rights of Bonnie & Company and duties it owed to Bonnie & Company.

(Boerer Aff. ¶ 38.)

This Court briefly will review the facts underlying plaintiffs' fraud claim. Plaintiffs claim that on May 25, 1989, Boerer agreed to pledge a $1,000,000 Treasury Bill in exchange for BTC's promise not to terminate the Factoring Agreement. The parties offer differing versions of the discussions that occurred during the May 25, 1989, meeting at which this agreement was allegedly reached. (Boerer Aff. ¶¶ 23–26, 38); (BTC Memo at 25–28.) The parties dispute whether the $1,000,000 Treasury Bill was to contain a termination date of September 15, 1989. Following the May 25, 1989, meeting, BTC sent to Boerer a security agreement memorializing her $1,000,000 pledge which did not contain any termination date. (Boerer Aff. ¶ 28.) Boerer's attorney returned a "corrected" version of the security agreement which was signed only by Boerer—not by BTC—and which contained the September 15, 1989, termination date. *Id.* ¶¶ 29–30. Plaintiffs state that BTC did not accept the corrected security agreement. *Id.* ¶ 31. Plaintiffs claim that BTC's actions constituted fraud because BTC terminated the Factoring Agreement on August 2, 1989, allegedly in derogation of the May 25, 1989, agreement. *Id.* ¶ 38.

Section 8.1 of the Factoring Agreement provides that "[t]his Agreement shall ... continue in full force and effect until terminated by either of us giving to the other at least sixty (60) days prior written notice." (Notice of Motion at Exh. B.) Section 10.1 of the Factoring Agreement ("Section 10.1") provides that "[n]o provision of this Agreement may be modified or amended orally or by course of conduct but only by a written instrument signed by both [parties]." *Id.*

■ Once again, this Court reiterates its dismay at the shoddy drafting of plaintiffs' pleadings. This point is particularly appropriate regarding the instant fraud claim, as Federal Rule of Civil Procedure Rule ("Rule") 9(b) unequivocally demands that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R.Civ. P. 9(b). Although defendant did not object to this claim on Rule 9(b) grounds, courts may do so *sua sponte*. *See Schreiber Distributing Co. v. Serv–Well Furniture Co., Inc.,* 806 F.2d 1393, 1395–96 (9th Cir.1986). This Court, however, reluctantly declines this opportunity, and grants plaintiffs a break by considering the substantive issues underlying plaintiffs' fraud claim and the arguments raised in defendant's motion for summary judgment.

Although defendant does not object to plaintiffs' fraud claim on Rule 9(b) grounds, defendant presents several arguments in support of its motion for summary judgment on plaintiffs' "unspecified fraud claim." (BTC Memo at 25–28.) First, defendant points out that the Factoring Agreement contains a provision expressly prohibiting its modification, except by a writing signed by both parties. *Id.* at 26. Defendant argues that this provision precludes plaintiffs' allegations of unwritten agreements to the contrary. *Id.* Second, defendant argues that, because the public policy of New York bars banks from orally agreeing not to enforce a contract, plaintiffs' claim that defendant represented that it would not terminate the Factoring Agreement is barred. *Id.* at 27. Finally, defendant argues that, as a matter of law, plaintiffs could not have reasonably relied upon any unwritten representation con-

trary to the express terms of their agreement with defendant. *Id.* at 28. Plaintiffs did not respond to any of defendant's arguments rebutting plaintiffs' fraud claim.

■ The elements of common law fraud are: (1) the defendant made a material false representation or omission; (2) the defendant intended to defraud the plaintiff thereby; (3) the plaintiff reasonably relied upon the representation; and (4) the plaintiff suffered damage as a result of his reliance. *Swersky v. Dreyer and Traub,* 219 A.D.2d 321, 326, 643 N.Y.S.2d 33, 36 (N.Y.App.Div.1996) (citing *Banque Arabe et Internationale D'Intvestissement v. Maryland National Bank,* 57 F.3d 146, 153 (2d Cir.1995) (applying New York law)).

■ Absent fraud or other excuse, signatories to an agreement are conclusively presumed knowingly to agree to all of the agreement's terms. *See Progressive Casualty Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela,* 991 F.2d 42, 46 (2d Cir.1993) (citing *Level Export Corp. v. Wolz, Aiken & Co.,* 305 N.Y. 82, 87, 111 N.E.2d 218, 221 (1953)). In addition, under New York law, where an agreement contains a clause barring oral modifications, "if the only proof of an alleged agreement to deviate from a written contract is the oral exchanges between the parties, the writing controls." *Towers Charter & Marine Corp. v. Cadillac Ins. Co.,* 708 F.Supp. 612, 614 (S.D.N.Y.1989) (citing *Rose v. Spa Realty Assoc.,* 42 N.Y.2d 338, 343, 397 N.Y.S.2d 922, 926, 366 N.E.2d 1279, 1282 (1977)).

If a party moving for summary judgment satisfies its burden of establishing the absence of a genuine question of material fact on an issue, the burden shifts to the nonmoving party to present specific facts that demonstrate a genuine issue for trial. Fed. R.Civ. P. 56(e); *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. In the instant case, defendant has established that the Factoring Agreement explicitly provides that either party could unilaterally terminate the agreement upon sixty days notice, and that the agreement could be modified only by a written instrument signed by both parties. Plaintiffs, however, have not responded with specific facts that demonstrate a genuine is-

sue for trial. They have not alleged that they were fraudulently or otherwise wrongly induced to enter the Factoring Agreement. Plaintiffs similarly have failed either to allege or to prove the existence of any written agreement—let alone one signed by both parties—that expressly alters the parties' ability to terminate the Factoring Agreement.

Under New York law, the failure to offer such proof raises the conclusive presumption that plaintiffs were aware of Sections 8.1 and 10.1 of the Factoring Agreement, and consequently, were aware of both the agreement's unilateral termination provision and the steps necessary to modify it. *See Progressive Casualty Ins. Co.,* 991 F.2d at 46 (citation omitted). In light of plaintiffs' presumed knowledge of the Factoring Agreement, this Court finds that plaintiffs have produced no facts to establish that they could reasonably have relied upon BTC's alleged oral modification of the Factoring Agreement on May 25, 1989, under which BTC allegedly relinquished its right to unilaterally terminate the agreement. Accordingly, this Court finds that plaintiffs have failed to satisfy their burden of production in response to defendant's motion for summary judgment, and that defendant is therefore entitled to summary judgment on plaintiffs' fraud claim.

*e. Claim 5: Breach of Duty of Confidentiality*

■ Plaintiffs do not plead in Count Five that defendant breached a duty of confidentiality owed to them. Rather, in their memorandum in opposition to summary judgment, plaintiffs assert for the first time that defendant "breached its duty of confidentiality when it transmitted information regarding the company's finances through open facsimile lines." (Plaintiffs' Memo at 38.) Defendant argues, in its reply memorandum, that it owed plaintiff no duty of confidentiality. (BTC Reply Memo at 20–21.) This Court takes a dim view of claims raised for the first time in a motion opposing summary judgment. For the sake of completeness, however, this Court will address plaintiffs' allegations of defendant's breach of a duty of confidentiality.

In determining whether a duty of confidentiality is owed by a bank to its customers, New York distinguishes between a bank's depositors and its debtors. *See, e.g., Sharma v. Skaarup Ship Mgt. Corp.*, 699 F.Supp. 440, 449 (S.D.N.Y.1988), *aff'd*, 916 F.2d 820 (2d Cir.1990), *cert. denied*, 499 U.S. 907, 111 S.Ct. 1109, 113 L.Ed.2d 218 (1991) (citation omitted); *Norkin v. Hoey*, 181 A.D.2d 248, 255, 586 N.Y.S.2d 926, 931 (N.Y.App.Div. 1992); *Boccardo v. Citibank, N.A.*, 152 Misc.2d 1012, 1014–15, 579 N.Y.S.2d 836, 838 (N.Y.Sup.Ct.1991). "[W]hatever expectations of confidentiality may inhere in the traditional relationship between a bank and a depositor, such expectations are wholly lacking in the context of the debtor-creditor loan relationship ... even under the most liberal authorities in this state." *Norkin*, 181 A.D.2d at 255, 586 N.Y.S.2d 926. The status of a debtor's loan is "not information that the borrower would normally expect would be kept confidential. *One who defaults on his debts ... cannot expect that his default will be kept a secret." Graney Development Corp. v. Taksen*, 92 Misc.2d 764, 768, 400 N.Y.S.2d 717, 720 (N.Y.Sup.Ct.1978) (emphasis added), *aff'd*, 66 A.D.2d 1008, 411 N.Y.S.2d 756 (N.Y.App.Div.1978). Plaintiffs counter that "[t]he Second Circuit has encouraged New York to recognize that banks owe a duty of confidentiality to all of their customers." (Plaintiffs' Memo at 39 (citing *Young v. United States Dept. of Justice*, 882 F.2d 633, 640–43 (2d Cir.1989))). Absent binding precedent, however, this Court declines the opportunity to rearrange the longstanding relationships among New York's banks and their customers. Accordingly, this Court finds that, as debtor and creditor, no duty of confidentiality existed between these parties. Therefore, summary judgment should be granted to defendant on plaintiffs' claim of breach of confidentiality.

*f. Claim 6: Mental Anguish and Emotional Distress*

■ Within Count Five, plaintiffs claim that "[t]he actions of [BTC] caused tremendous personal hardship upon the plaintiff, Bonnie Boerer[,] and further resulted in extreme mental anguish and emotional distress." (Complaint ¶ 63.) Curiously, plaintiffs also include in Count Five a separate damages claim for "mental anguish and emotional distress for breach of contract." *Id.* Because of the vague and ambiguous drafting of plaintiffs' papers, it is difficult to determine whether both emotional distress claims emanate from BTC's alleged breach of contract, or if the first claim arises in tort. Defendant's summary judgment papers reflect a similar confusion, and therefore address both possibilities. (BTC Memo at 32–34.) Plaintiffs' submissions opposing summary judgment offer no clarification—beyond the allegations in the Complaint, plaintiffs do not elaborate or substantiate their claims for emotional distress. As a result, this Court will address plaintiffs' first emotional distress claim assuming it is in tort, and will reserve decision on their emotional distress for breach of contract claim for resolution with plaintiffs' damages claims below.

In support of its motion for summary judgment on this claim, defendant does not dispute any of plaintiffs' factual allegations concerning the faxing of the notice of termination. *See* (BTC Memo at 32–33.) Instead, defendant argues that its conduct did not rise to the level required to sustain a claim for intentional infliction of emotional distress. *Id.* In addition, defendant argues that plaintiffs have proffered no evidence suggesting a causal connection between the faxing of the notice of termination and anyone's (presumably Boerer's) emotional distress. Plaintiffs failed to respond to defendant's arguments in the papers they submitted in opposition to summary judgment.

■ Under New York law, the tort of intentional infliction of emotional distress requires "extreme and outrageous conduct, which so transcends the bounds of decency as to be regarded as atrocious and intolerable in a civilized society." *Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 144, 480 N.E.2d 349, 490 N.Y.S.2d 735 (1985) (citation omitted). Recently, the New York Court of Appeals explained that:

The tort [of intentional infliction of emotional distress] has four elements: (i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial

probability of causing, severe emotional distress; (iii) a causal connection between the conduct and the injury; and (iv) severe emotional distress.

*Howell v. New York Post Co.*, 81 N.Y.2d 115, 121, 612 N.E.2d 699, 596 N.Y.S.2d 350 (1993) (Kaye, C.J.). The court has stated that "the 'requirements of the rule are rigorous, and difficult to satisfy.'" *Id.* (quoting Prosser and Keeton, Torts § 12 at 60–61 (5th ed. 1984)). In fact, Chief Judge Kaye noted in *Howell* that, "of the intentional infliction of emotional distress claims considered by this Court, every one has failed because the alleged conduct was not sufficiently outrageous." *Id.* (listing cases).

*Freihofer* exemplifies the Court of Appeals' rigid stance regarding intentional infliction of emotional distress claims. In *Freihofer*, plaintiff sued a publisher for printing admittedly confidential court records of plaintiffs' divorce. These records contained allegations that plaintiff had subjected his former wife to physical and mental cruelty. 65 N.Y.2d at 137–39, 480 N.E.2d 349, 490 N.Y.S.2d 735. The Court of Appeals held that these facts "clearly" failed to meet the standard for intentional infliction of emotional distress, and that summary judgment therefore should be entered for defendant publisher. 65 N.Y.2d at 144, 480 N.E.2d 349, 490 N.Y.S.2d 735.

In light of the Court of Appeals' teachings, this Court finds that there is no disputed issue of material fact regarding plaintiffs' intentional infliction of emotional distress claim. The actions which plaintiffs allege that BTC undertook simply do not constitute "extreme and outrageous" conduct which can be regarded as "atrocious and intolerable in a civilized society." The fax transmission of plaintiffs' corporate financial communications to one of plaintiffs' own offices is far less "atrocious" or "intolerable" than the public dissemination of records regarding the demise of an abusive marriage. Thus, if the latter falls "clearly" short of the New York standard for intentional infliction of emotional distress, as it did in *Freihofer*, the former must necessarily fall as well. This Court thus finds that plaintiffs' allegations present no disputed issue of material fact, and that

defendant's motion for summary judgment on plaintiffs' intentional infliction of emotional distress should be granted.

### g. Claim 7: Damages

Plaintiffs' final claim in Count Five seeks damages for: (1) lost profits in the amount of $5,000,000; (2) Boerer's loss of two years' salary in the amount of $2,400,000; and (3) mental anguish and emotional distress for breach of contract in the amount of $2,000,-000. (Complaint ¶ 63.) This Court will resolve the first two damages claims together, then address the third claim individually.

### i. Loss of Profits & Loss of Salary

Defendant seeks summary judgment on the issue of plaintiffs' damages for lost profits and salary. Defendant sets forth five bases for summary judgment: (1) BTC did not breach the Factoring Agreement; (2) the damages sought by plaintiffs are not compensable because they could not have been foreseen at the time the contract was negotiated; (3) as a matter of law, there can be no recovery for emotional distress resulting from a breach of contract; (4) plaintiffs admitted in the New Jersey Action separate reasons for Bonnie & Co,'s failure, none of which are attributable to BTC; and (5) by reinstating the Factoring Agreement and commercial relations with BTC, plaintiffs waived any claims they might have had against BTC. (BTC Memo at 31–35.)

Plaintiffs counter that the loss of future profits are recoverable in a contract action when they are unquestionably caused by the breach and the damages are neither remote nor speculative. (Plaintiff's Memo at 49.) In addition, plaintiffs assert that because BTC's alleged breach of fiduciary duties were the proximate cause of plaintiffs' damages, BTC's liability is to be measured by the full extent of plaintiffs' losses. *Id.* at 50. Plaintiffs claim that, based on Bonnie & Co.'s "six year history of performance and profitability," lost profits and salary are readily calculable. *Id.* at 50–51. Finally, plaintiffs claim that to the extent damages cannot be precisely calculated, BTC must bear the "risk of uncertainty which its own wrong created." *Id.* at 50 (citation omitted).

In actions for breach of contract, it is well established that "the nonbreaching party may recover general damages which are the natural and probable consequences of the breach." *Kenford Co., Inc. v. County of Erie*, 73 N.Y.2d 312, 318, 537 N.E.2d 176, 540 N.Y.S.2d 1 (1989). In the usual course, a party "may not recover for lost profits unless they are within the contemplation of the parties at the time the contract was entered into." *Ashland Mgt., Inc. v. Janien*, 82 N.Y.2d 395, 403, 624 N.E.2d 1007, 604 N.Y.S.2d 912 (1993). The rule that damages must be in the contemplation of the parties is a rule of foreseeability. *Id.* That is, "[t]he party breaching the contract is liable for those risks foreseen at the time the contract was made. The breaching party need not have foreseen the breach itself, however, or the particular way the loss came about. It is only necessary that the loss from a breach is foreseeable and probable." *Id.* (citations omitted). Moreover,

> [i]n determining the reasonable contemplation of the parties, the nature, purpose, and particular circumstances of the contract known by the parties should be considered, as well as 'what liability the defendant fairly may have supposed to have assumed consciously, or to have warranted the plaintiff reasonably to suppose that it assumed, when the contract was made.'

*Kenford*, 73 N.Y.2d at 319, 537 N.E.2d 176, 540 N.Y.S.2d 1 (internal citations omitted) (quoting *Globe Ref. Co. v. Landa Cotton Oil Co.*, 190 U.S. 540, 544, 23 S.Ct. 754, 755, 47 L.Ed. 1171 (1903) (Holmes, J.)).

In addition to the requirement that damages be in the contemplation of the parties when the contract was consummated, the damages also must be capable of measurement with reasonable certainty. *Ashland Mgt., Inc.*, 82 N.Y.2d at 395, 624 N.E.2d 1007, 604 N.Y.S.2d at 915. This second factor does not demand that damages be determined with "mathematical precision." *Id.* Rather, it requires only that damages be "capable of measurement based upon known, reliable factors without undue speculation." *Id.* (citations omitted).

This Court finds that BTC has failed to carry its summary judgment burden regarding plaintiffs' damages claims for lost profits and salary. None of BTC's grounds for summary judgment on the damages claims is persuasive. First, BTC claims that there can be no damages because it did not breach the Factoring Agreement. (BTC Memo at 31.) However, as this Court already has found, a genuine material question of fact exists as to whether BTC breached the Factoring Agreement by faxing its notice of termination.

Second, defendant offers only conclusory statements that the damages sought by plaintiffs are not compensable, as a matter of law, because they were not foreseeable at the time the Factoring Agreement was entered into, *id.* at 31–32, without offering evidence of a lack of foreseeability. Such conclusory allegations are insufficient to prevail on summary judgment. *See Adickes*, 398 U.S at 157, 90 S.Ct. at 1609.

Third, BTC's claim that, by reinstating their relationship with BTC in October 1990, plaintiffs waived all prior claims they may have had against BTC, (BTC Memo at 34–35), is simply incorrect. Under New York law, the reinstatement of a contract waives only claims of duress associated with the original execution of the contract, not other claims arising from the contract. *See Henkin v. General Electric Credit Corp.*, 925 F.2d 231, 233 (7th Cir.1991) (applying New York law). Accordingly, the October 1990 reinstatement of the Factoring Agreement does not affect plaintiffs' claims for breach of the Factoring Agreement.

Fourth, BTC directs this Court to the New Jersey Action, and states that plaintiffs have previously sworn that causative factors other than BTC were responsible for Bonnie & Co.'s demise. (BTC Memo at 34.) This statement, standing by itself absent details, creates an issue of fact. As a result, this Court finds that defendant's summary judgment motion should be denied on plaintiffs' claims for damages for lost profits and salary.

*ii. Mental Anguish & Emotional Distress for Breach of Contract*

Plaintiffs' final damages claim in Count Five seeks compensation for "mental

anguish and emotional distress for breach of contract." (Complaint ¶ 63.) Defendant, in its motion for summary judgment, argues that "as a matter of law, Boerer is not entitled to damages" on this claim. (BTC Memo at 32.) Plaintiffs' submissions in opposition to summary judgment do not respond to defendant's legal argument, nor do they proffer any evidence of the alleged mental anguish and emotional distress.

In New York, it is "generally held that emotional and mental distress is not compensable in a breach of contract action." *Martin v. Donald Park Acres at Hasting, Inc.*, 54 A.D.2d 975, 975, 389 N.Y.S.2d 31, 32 (N.Y.App.Div.1976) (citing *Boyce v. Greeley Square Hotel Co.*, 228 N.Y. 106, 111, 126 N.E. 647, 649 (1920)); *see also Pitcherello v. Moray Homes, Ltd*, 150 A.D.2d 860, 862–63, 540 N.Y.S.2d 387, 390 (N.Y.App.Div. 1989); *Wehringer v. Standard Security Life Ins. Co. of N.Y.*, 57 N.Y.2d 757, 759, 440 N.E.2d 1331, 454 N.Y.S.2d 984 (1982). "This is especially true when the breaching party is engaged in private enterprise and there is no allegation of accompanying physical injury." *Martin*, 54 A.D.2d at 975, 389 N.Y.S.2d at 32. Moreover, "bad faith alone is insufficient to justify an exception to the general rule." *Id.*

To reiterate, if a party moving for summary judgment satisfies its burden of establishing the absence of a genuine question of material fact on an issue, the burden shifts to the non-moving party to present specific facts that demonstrate a genuine issue of fact for trial. Fed.R.Civ.P. 56(e); *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356. In the instant case, defendant has established that plaintiff has alleged no facts to support a claim of mental anguish and emotional distress for breach of contract. Plaintiff has done nothing to refute defendant's argument. As a result, this Court finds that summary judgment should be granted to BTC on plaintiffs' claim for mental anguish and emotional distress for breach of contract.

### 6. Count Six

Returning to the primary issues contained in the Complaint, Count Six alleges that, because of BTC's alleged breaches of the Factoring Agreement and fiduciary duties in Counts One and Two, plaintiffs have incurred costs of $250,000, which they seek to recover. (Complaint ¶¶ 65–66.) Plaintiffs also claim to "reserve the right, upon a trial of this action, to prove and recover all costs incurred as a result of the acts of defendant complained of herein." *Id.* ¶ 66. Defendant does not directly address Count Six in its summary judgment papers.

As previously discussed, this Court found that defendant is not entitled to summary judgment on Count One—plaintiffs' breach of contract claim. Because this Court found that there are genuine issues of material fact regarding plaintiffs' breach of contract claim, this Court finds that summary judgment is inappropriate on the issue of costs allegedly incurred by plaintiffs as a result of this alleged breach. Accordingly, this Court finds that defendant's motion for summary judgment regarding payment of plaintiffs' costs associated with Count One should be denied.

Conversely, this Court finds that defendants are entitled to summary judgment on plaintiffs' claim for costs arising from Count Two—plaintiffs' claim based on defendant's alleged breach of fiduciary duties. To reiterate, this Court found that summary judgment should be granted to defendant on Count Two of plaintiffs' Complaint because the relationship between plaintiffs and BTC was that of debtor and creditor, not of fiduciaries. Because this Court found that defendants are entitled to summary judgment on the substantive aspects of Count Two, this Court also finds that defendant is entitled to summary judgment on the issue of costs associated with that claim. Accordingly, this Court finds that defendant's motion for summary judgment regarding payment of plaintiffs' costs associated with Count Two should be granted.

### B. Defendant's Motion For Summary Judgment On Defendant's Counterclaims

Defendant seeks summary judgment on each of its eleven affirmative defenses, including seven counterclaims. (Answer ¶¶ 20–55.) First, BTC asserts that "[t]he Complaint should be dismissed for failing to state

a claim upon which relief can be granted." *Id.* ¶ 20. Second, defendant claims that, with respect to the accounts receivable, plaintiff violated the terms of the Factoring Agreement by failing to obtain BTC's "written credit approval for all of the [r]eceivables which were charged back" to Bonnie & Co. and, for certain receivables, failing "to effect delivery of goods or perform necessary services within thirty days after the time that [BTC's] credit approval was given." *Id.* ¶¶ 21–22. Third, BTC claims that, under the terms of the Factoring Agreement "[a]ll chargebacks of [r]eceivables were proper." *Id.* ¶¶ 24–27. Fourth, BTC contends that it rendered "monthly statements of account" to plaintiffs pursuant to the Factoring Agreement and that Bonnie & Co. "failed to make timely written objection to [BTC] of the amounts set forth in the monthly statements of account," as required by the Factoring Agreement. *Id.* ¶¶ 28–29. Accordingly, BTC contends that "t[o] the extent timely written objections were not received by [BTC], [Bonnie & Co.] is bound by the amounts stated as owing from [Bonnie & Co.] to [BTC] in these monthly statements of account." *Id.* ¶ 29.

BTC's Fifth through Eleventh affirmative defenses simultaneously set forth BTC's First through Seventh counterclaims. BTC's Fifth Affirmative Defense/First Counterclaim asserts that BTC "made periodic advance payments, loans and cash advances to [Bonnie & Co.]" which were "only partially repaid through collection by [BTC] of [r]eceivables sold and assigned by [Bonnie & Co.] to [BTC]." *Id.* ¶ 31. BTC contends that these loans and advances have led to a "debit balance owing to [BTC] from [Bonnie & Co.] of $127,608.35." *Id.* ¶ 33. BTC claims that it has "sustained damages and is entitled to recover from [Bonnie & Co.] an amount to be determined at trial, but in no event less than [$127,608.35] plus continuing accruing interest thereon at the agreed rate of prime plus 2%." *Id.* ¶ 35.

BTC's Sixth Affirmative Defense/Second Counterclaim alleges that Section 6.2 of the Factoring Agreement bound Bonnie & Co. to "indemnify and hold [BTC] harmless with respect to: ... all fees, costs and expenses incurred by [BTC]" in its efforts to collect amounts owed it by Bonnie & Co. *Id.* ¶ 36. Accordingly, BTC seeks to recover from Bonnie & Co. BTC's "actual and reasonable attorneys' fees incurred and to be incurred" by [BTC] in its efforts to recover the $127,608.35 plus interest BTC alleges it is owed by Bonnie & Co. in its Fifth Affirmative Defense/First Counterclaim. *Id.* ¶¶ 37–38

In its Seventh Affirmative Defense/Third Counterclaim, BTC seeks to recover the alleged Bonnie & Co. indebtedness ($127,608.35 plus interest) from Boerer based on the Limited Guaranty whereby Boerer "unconditionally guaranteed to repay up to $2,000,000.00 of [Bonnie & Co.'s] debts owing to [BTC] under the Factoring Agreement." *Id.* ¶¶ 39–41.

In its Eighth Affirmative Defense/Fourth Counterclaim, BTC contends that, "pursuant to the [Limited] Guaranty, Boerer agreed to pay [BTC] all of its costs and expenses, including [BTC's] reasonable and necessary attorneys' fees, incurred by [BTC] in its efforts to enforce any of the obligations of Boerer under the [Limited] Guaranty." *Id.* ¶ 42. BTC seeks, under the Limited Guaranty, to recover from Boerer its "actual and reasonable attorneys' fees in an amount to be determined at trial." *Id.* ¶ 43.

BTC's Ninth Affirmative Defense/Fifth Counterclaim alleges that Boerer "executed and delivered to [BTC] the Security Agreement wherein Boerer pledged to [BTC] a Treasury Bill in the amount of $1,000,000.00." *Id.* at ¶ 44. BTC claims that under the Security Agreement's terms, BTC received a "first security interest" in the Treasury Bill "securing the repayment of the [$127,608.325 plus interest] and Boerer's obligations of payment under the Limited Guaranty, which security interest was thereafter duly perfected in accordance with the Uniform Commercial Code." *Id.* ¶ 45. As holder of an allegedly "perfected first security interest in the [Treasury Bill]" BTC seeks to foreclose upon its interest and seize the Treasury Bill. *Id.* ¶ 46. BTC claims that under the terms of the Security Agreement, it is entitled to: (1) a declaratory judgment declaring that its interest in the Treasury Bill is superior to all others; (2) an order foreclosing its perfected security interest in the Treasury Bill and

allowing it to be seized and liquidated by BTC to satisfy the alleged indebtedness of Bonnie & Co. and/or obligations owed by Boerer under the [Limited] Guaranty; and (3) a recovery of BTC's "costs associated with the liquidation of the Treasury Bill, including its reasonable attorneys' fees, with any surplus remaining thereafter, if any, to be returned to Boerer." *Id.* ¶ 47.

BTC's Tenth Affirmative Defense/Sixth Counterclaim concerns the Treasury Bill presently held by Union Counties Trust ("UCT") of Linden, New Jersey. *Id.* ¶ 48. BTC contends that after making demand on Bonnie & Co. and Boerer to repay the alleged $127,608.35 indebtedness, BTC made demand on UCT to surrender the Treasury Bill to BTC. *Id.* ¶ 49. BTC alleges that, contrary to the Security Agreement, Boerer wrongfully directed UCT not to release the Treasury Bill to BTC. *Id.* at ¶ 50. BTC seeks an injunction ordering Boerer to direct UCT to release the Treasury Bill to BTC to satisfy plaintiffs' alleged indebtedness plus all costs and attorneys' fees, with any excess to be returned to Boerer. *Id.* ¶ 52.

In its Eleventh Affirmative Defense/Seventh Counterclaim, BTC alleges that, as a result of "Boerer's unauthorized direction to [UCT] not to release the [Treasury Bill], [BTC] has incurred and will continue to incur attorneys' fees in its efforts to enforce its rights under the Security Agreement and to obtain possession of [the Treasury Bill]." *Id.* ¶ 54. BTC seeks to recover these costs. *Id.* ¶ 55.

In addition to disputing the facts underlying defendant's counterclaims, plaintiffs offer the following laundry list of affirmative defenses to them:

1. Failure to state a claim upon which relief can be granted.

2. Failure in the consideration.

3. Defendant/Counterclaimant is estopped by its conduct from the requested relief.

4. Defendant/Counterclaimant's claims are barred by the Doctrine of Laches.

5. Statute of Limitations.

6. Breach of Contract.

7. The action is barred by the Statute of Frauds.

8. Equitable estoppel and unclean hands.

9. Defendant/Counterclaimant [is] barred from recovery by the Parol Evidence Rule.

10. Defendant/Counterclaimant is barred from relief under the Doctrine of Waiver.

11. Damages, if any, were the result of avoidable consequences and are solely attributable to defendant's conduct.

12. Plaintiffs / Counterclaim – Defendants violated no duty to defendant/counterclaimant with regard to the subject matter of the within matter.

*See generally* (Affirmative Defenses to Counterclaim.) Beyond submitting a list resembling a contracts or civil procedure course syllabus, however, plaintiffs have provided this Court neither legal argument nor evidence supporting any of these purported defenses.

This Court repeats yet again that, if a party moving for summary judgment satisfies its burden of establishing the absence of a genuine material fact on an issue, the burden shifts to the non-movant to come forward with specific facts that show a genuine issue for trial. Fed.R.Civ.P. 56(e); *see also Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. In the papers submitted to this Court, BTC specifically addressed and rebutted each of plaintiffs' affirmative defenses, and moved for summary judgment on each of them. (BTC Memo at 35–41.) Plaintiffs, however, did not respond to either defendant's arguments or their motions for summary judgment regarding any of plaintiffs' affirmative defenses. Without *any* response by plaintiffs—factual or rhetorical—in support of their affirmative defenses, this Court finds that plaintiffs have failed once again to carry their summary judgment burden. It is not the job of this, or any other, court to construct arguments or to ferret out evidentiary support on behalf of a party. As a result, this Court will consider each of BTC's counterclaims without regard to plaintiffs' affirmative defenses. Instead, the Court will

consider only plaintiffs' factual denials and disputes to defendant's counterclaims.

### 1. BTC's Affirmative Defenses One through Four

The first four of BTC's eleven affirmative defenses relate to the parties' respective claims of breach of the Factoring Agreement: (1) plaintiffs' failure to state a claim for which relief can be granted, (Answer ¶ 20); (2) Bonnie & Co. violated Section 2.2 of the Factoring Agreement by failing to obtain BTC's prior credit approval on all receivables, id. ¶¶ 21–22; (3) all of defendant's chargebacks of accounts receivable to Bonnie & Co. were consistent with the Factoring Agreement, id. ¶¶ 24–27; and (4) BTC rendered monthly statements to Bonnie & Co., and that Bonnie & Co. failed to make timely written objections to those reports, as mandated by the Factoring Agreement. Id. ¶¶ 28–29.

In its discussion of Count One, this Court already has found that material questions of fact exist regarding any alleged breach of the Factoring Agreement. All four of the above-cited affirmative defenses concern plaintiffs' alleged breach of the Factoring Agreement, and thus involve unresolved material questions of fact. Therefore, this Court finds that defendant's motion for summary judgment on defendant's first four affirmative defenses should be denied.

### 2. BTC's Fifth Affirmative Defense/First Counterclaim

In its Fifth Affirmative Defense/First Counterclaim, BTC claims that, pursuant to the Factoring Agreement, BTC "made periodic advance payments, loans and cash advances to [Bonnie & Co.]" which Bonnie & Co. never fully repaid. (Answer ¶ 31.) Bonnie & Co.'s resulting indebtedness is alleged to be in the amount of $127,608.35, plus interest at the agreed upon rate. Id. ¶ 33. BTC therefore claims damages in an amount to be determined at trial, but in no case less than $127,608.35 plus interest. Id. ¶ 35. Plaintiffs admit that BTC made periodic payments, loans, and cash advances, but deny that they were only partially repaid. (Answer to Counterclaim ¶¶ 1–6.) Plaintiffs thus dispute BTC's claims that it is owed $127,-608.35 plus interest. Id.

As this Court noted in its discussion of Count One, the essential elements of a contract claim under New York law are: (1) formation of a contract between the parties; (2) performance by plaintiffs; (3) non-performance by defendant; and (4) resulting damages to plaintiff. Litton, 767 F.Supp. at 1227.

In the case at bar, BTC claims in its Fifth Affirmative Defense/First Counterclaim that Bonnie & Co. has not performed its obligation under the Factoring Agreement to repay the loans and advances BTC made to Bonnie & Co. Bonnie & Co. disputes this claim, and submits an affidavit from an expert witness, Michael Loguercio ("Loguercio"), who disputes the alleged indebtedness of Bonnie & Co. to BTC. (Affidavit of Michael Loguercio in Opposition of Defendant's Motion for Summary Judgment, Bonnie & Co. Fashions, Inc. v. Bankers Trust Co., 91 Civ. 0341 ("Loguercio Aff.") at 7 (June 9, 1994).) Loguercio claims that BTC owes Bonnie & Co. $111,390.97. Id. A cursory review of Loguercio's supporting documentation shows that he relies, in part, on BTC's allegedly improper chargebacks in rendering his calculations concerning the indebtedness. Id. at Exh. 1. BTC, however, maintains that all of its chargebacks were proper and has offered evidence in support of that assertion. See generally (Prizzi Aff.); (Contrucci Aff.)

To succeed on a motion for summary judgment, the moving party must establish that no disputed issues of material fact exist. Fed.R.Civ.P. 56(c). As discussed above, the documentation submitted by each party on the subject matter of BTC's Fifth Affirmative Defense/First Counterclaim contradicts that submitted by the other party. Consequently, this Court faces two competing versions of the facts underlying BTC's claim that Bonnie & Co. has not performed its obligations under the Factoring Agreement. A court faced with a motion for summary judgment is not to resolve contested issues of fact, but rather, is to determine the existence of any contested issues of material fact. Knight, 804 F.2d at 11. Because the parties' competing versions of the facts regarding

BTC's Fifth Affirmative Defense/First Counterclaim constitute contested issues of material fact, this Court finds that defendant's motion for summary judgment on its Fifth Affirmative Defense/First Counterclaim should be denied.

### 3. BTC's Sixth Affirmative Defense/Second Counterclaim

In its Sixth Affirmative Defense/Second Counterclaim, BTC seeks to recover from Bonnie & Co. the "actual and reasonable attorneys' fees incurred and to be incurred by the Bank in its efforts to collect the [Bonnie & Co.] Indebtedness" which forms the basis of defendant's Fifth Affirmative Defense/First Counterclaim. (Answer ¶¶ 36–38.) Section 6.2 of the Factoring Agreement ("Section 6.2") states that Bonnie & Co. agreed to

> indemnify and hold [BTC] harmless with respect to ... all fees, costs and expenses of collection incurred by [BTC] in efforts to enforce payment of any of the Obligations or to enforce payment of any Accounts, charged or chargeable to [Bonnie & Co.'s] account ... or in defending or prosecuting any actions of proceedings arising out of or in any way related to this Agreement [including] the reasonable fees, costs and disbursements of any attorney whom [BTC] engage[s] in connection with any or all of the foregoing. [BTC] may charge to [Bonnie & Co.'s] account, at any time and from time to time any or all of the foregoing amounts which shall be added to and deemed part of the Obligations.

(Notice of Motion at Exh. B.) Plaintiffs, without proposing an alternative, appear to disagree with defendant's interpretation of Section 6.2 and "refers [sic] the Court to the entire Factoring Agreement for the precise language, true intent and legal meaning" of Section 6.2. (Answer to Counterclaim ¶ 7.)

According to the Second Circuit, "in a contract dispute, summary judgment may be granted only where the language of the contract is unambiguous." *Nowak,* 81 F.3d at 1192 (citation omitted). Under New York law, whether a written contract is unambiguous is a question of law for the trial court whose determinations will be reviewed "*de novo."* *Id.,* (citation omitted). Contract terms are ambiguous if they are

> capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

*Id.* (citation omitted). Conversely, "no ambiguity exists when contract language has a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference in opinion." *Sayers,* 7 F.3d at 1095 (citation omitted)

Even when parties dispute the meaning of specific contract clauses, a Court's task is "to determine whether such clauses are ambiguous when read in the context of the entire agreement." *Id.* (quotation omitted); *see also Williams Press,* 37 N.Y.2d at 440, 373 N.Y.S.2d 72, 335 N.E.2d 299. By examining the entire contract, courts "safeguard against adopting an interpretation that would render any individual provision superfluous." *Sayers,* 7 F.3d at 1095 (citation omitted); *see also Rothenberg,* 755 F.2d at 1019; *Muzak,* 1 N.Y.2d at 46, 133 N.E.2d 688, 150 N.Y.S.2d 171. However, "[p]arties to a contract may not create an ambiguity merely by urging conflicting interpretations of their agreement." *Sayers,* 7 F.3d at 1095 (citations omitted).

With these principles in mind, this Court finds that Section 6.2 of the Factoring Agreement is not susceptible to more than one reasonable interpretation. Section 6.2 clearly and unambiguously renders Bonnie & Co. liable for all expenses incurred by BTC in connection with BTC's efforts to collect from Bonnie & Co. any obligation "arising out of or in any way related to this [Factoring] Agreement." (Notice of Motion at Exh. B.) By signing the Factoring Agreement, Boerer agreed in Section 6.2 that Bonnie & Co. would "indemnify and hold [BTC] harmless with respect to: ... all fees, costs and expenses of collection incurred by [BTC] in efforts to enforce payment of any of the

Obligations ... [including] the reasonable fees, costs and disbursements of any attorney whom [BTC] [may] engage" to collect any of Bonnie & Co.'s debts to BTC arising from the Factoring Agreement. *Id.*

Looking to the entire Factoring Agreement, Section 1.4 states that the term "Obligations," which is used in Section 6.2, "shall mean any and all loans, advances, indebtedness, liabilities, debit balances and obligations of any kind owing by [Bonnie & Co.] to [BTC]." *Id.* The funds at the center of the instant dispute are precisely the kind of "obligations" that BTC claims are owed to it by Bonnie & Co. in BTC's Sixth Affirmative Defense/Second Counterclaim. (Answer ¶¶ 36–38.) Although plaintiffs deny their liability for BTC's attorney's fees and expenses, plaintiffs have offered no alternative interpretation of Section 6.2. They similarly have failed to cite another section of the Factoring Agreement, any case law, or any other authority in support of their position. Accordingly, this Court finds that the "definite and precise meaning" of Section 6.2 entitles defendant to full reimbursement by Bonnie & Co. of all of its reasonable attorneys' fees, costs and disbursements arising from BTC's attempts to collect debts from Bonnie & Co. "arising out of or in any way related to" the Factoring Agreement. Accordingly, this Court finds that BTC is entitled to summary judgment on its Sixth Affirmative Defense/Second Counterclaim.

### 4. BTC's Seventh Affirmative Defense/Third Counterclaim

BTC's Seventh Affirmative Defense/Third Counterclaim contends that Boerer owes it $127,608.35 plus interest. (Answer ¶¶ 39–41.) This counterclaim is based on the Limited Guaranty executed by plaintiff Boerer on October 6, 1990, by which she "unconditionally guaranteed to repay up to $2,000,000.00 of [Bonnie & Co.'s] debts owing to [BTC] under the Factoring Agreement." *Id.* at ¶ 39; (Notice for Motion on Summary Judgment at Exh. H.) Plaintiffs concede that Boerer entered into this Guaranty, but deny the indebtedness to BTC. (Answer to Counterclaim ¶ 10.)

For the reasons articulated regarding the Fifth Affirmative Defense/First Counterclaim, the amount, if any, of Bonnie & Co.'s indebtedness is a disputed question of material fact. Accordingly, this Court finds that summary judgment on BTC's Seventh Affirmative Defense/Third Counterclaim should be denied.

### 5. BTC's Eighth Affirmative Defense/Fourth Counterclaim

BTC's Eighth Affirmative Defense/Fourth Counterclaim seeks attorneys' fees under the provisions of the Limited Guaranty. (Answer ¶¶ 42–53.) The Limited Guaranty's opening paragraph in relevant part provides:

> the undersigned [Bonnie Boerer] irrevocably and unconditionally guarantee[s] to [BTC] payment when due ... of any and all liabilities of [Bonnie & Co.] to [BTC], together with all interest thereon and attorneys' fees, costs and expenses of collection incurred by [BTC] in enforcing any of such liabilities....

(Notice of Motion at Exh. H.) Curiously, plaintiffs concede the existence of the Limited Guaranty, (Answer to Counterclaim ¶ 10), but "deny knowledge or information sufficient to form a belief" as to the existence of its provision regarding attorneys' fees and collection costs. *Id.* ¶ 13.

It is an elementary principle of contract law that, in the absence of fraud or other excuse, the signatory to an agreement is conclusively presumed to know and assent to its contents, and is thus bound by its terms and conditions. *See Progressive Casualty Ins. Co.*, 991 F.2d at 46 (citation omitted). This Court strains to comprehend how plaintiffs can both acknowledge entering into an agreement yet deny knowledge of its first provision in the span of four paragraphs of a single pleading.

As set forth above in the discussion of defendant's Sixth Affirmative Defense/Second Counterclaim, a court may grant summary judgment in a contract dispute only where the language of the contract is "unambiguous." *Nowak*, 81 F.3d at 1192 (citation omitted). A contract's ambiguity is a question of law for the trial court. *Id.* A con-

tract is ambiguous if its terms are "capable of more that one meaning when viewed objectively by a reasonably intelligent person." *Id.* (citation omitted). However, no ambiguity exists where the contract has a "definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself and concerning which there is no reasonable basis for a difference of opinion." *Sayers,* 7 F.3d at 1095 (citations omitted). In making this determination, the court is to examine the entire contract, not merely the contract provision in question. *Id.*

This Court finds that the language of the Limited Guaranty rendering Boerer liable for defendant's costs and expenses in collecting Bonnie & Co.'s liabilities has a "definite and precise meaning," and is thus incapable of having more than one meaning. The Limited Guaranty clearly states that Boerer "irrevocably and unconditionally guarantee[s] to [BTC] payment ... of any and all liabilities of [Bonnie & Co.] [including] *attorneys' fees, costs and expenses of collection*" of Bonnie & Co.'s debts to BTC. (Notice of Motion at Exh. H (emphasis added).) No other provision in the Limited Guaranty alters this language. Thus, having signed the Limited Guaranty containing this unambiguous provision, this Court finds that Boerer rendered herself personally liable for BTC's attorneys' fees and other costs in BTC's efforts to collect Bonnie & Co.'s indebtedness, if any. Accordingly, defendant is entitled to summary judgment on its Eighth Affirmative Defense/Fourth Counterclaim.

*6. BTC's Ninth Affirmative Defense/Fifth Counterclaim*

In its Ninth Affirmative Defense/Fifth Counterclaim, BTC contends that it has a perfected security interest in the $1,000,000 Treasury Bill which Boerer pledged to BTC, and that BTC is entitled to foreclose upon it. (Answer ¶¶ 44–46.) In support of this contention, BTC points this Court both to the terms of the Security Agreement pledging the Treasury Bill and to executed and filed financing statements. (Notice of Motion at Exhs. A & I.) BTC seeks: (1) a declaratory judgment stating that its interest in the Treasury Bill is superior to all others; (2) an

order foreclosing its perfected security interest in the Treasury Bill and permitting it to be seized and liquidated by BTC to satisfy any indebtedness of Bonnie & Co. to BTC; and (3) recovery of BTC's costs associated with the liquidation, including attorney's fees. *Id.* ¶ 47. Plaintiffs admit that Boerer pledged a $1,000,000 Treasury Bill to BTC, but dispute every other contention made in defendant's counterclaim. (Answer to Counterclaim ¶¶ 15–18.)

As this Court previously found regarding Count Four, there are material questions of fact concerning the existence of any debt owed by Bonnie & Co. to BTC, and the amount of such debt, if any. Thus, this Court finds that it is premature to grant BTC the relief requested in this counterclaim, and that BTC's motion for summary judgment on its Ninth Affirmative Defense/Fifth Counterclaim should be denied.

*7. BTC's Tenth Affirmative Defense/Sixth Counterclaim*

In its Tenth Affirmative Defense/Sixth Counterclaim, BTC contends that the $1,000,000 Treasury Bill pledged to it as collateral is currently held by Union Counties Trust Co. of Linden, New Jersey. (Answer ¶ 48.) BTC further claims that, after it sought repayment of Bonnie & Co.'s debt from plaintiffs, it made demand on UCT to surrender the Treasury Bill to BTC. *Id.* ¶ 49. BTC alleges that plaintiff Boerer "wrongfully directed Union Counties Trust not to release the [$1,000,000] Collateral to [BTC]." *Id.* ¶ 50. As a result, BTC seeks an injunction ordering Boerer to direct UCT to release the Treasury Bill to BTC to satisfy plaintiffs' debts. *Id.* ¶ 52. Plaintiffs admit that the Treasury Bill is being held by UCT, but deny every other allegation made in this counterclaim. (Answer to Counterclaim ¶¶ 19–23.)

As BTC correctly points out, where a creditor presents *prima facie* evidence of a lending instrument and of default by a debtor, a court may grant summary judgment to the creditor. *See Banner Indus. v. Key B.H. Assoc., L.P.,* 170 A.D.2d 246, 246, 565 N.Y.S.2d 456, 456 (N.Y.App.Div.1991) (citations omitted). This, however, is not such a case. As discussed earlier, a material ques-

tion of fact exists regarding the amount, if any, owed to BTC by Bonnie & Co. This Court thus finds that it is inappropriate to order plaintiffs to release the Treasury Bill in satisfaction of a debt which this Court has not yet determined to exist. As a result, this Court finds that defendant's motion for summary judgment on its Tenth Affirmative Defense/Sixth Counterclaim should be denied.

### 8. *BTC's Eleventh Affirmative Defense/Seventh Counterclaim*

 In its Eleventh Affirmative Defense/Seventh Counterclaim, BTC asks this Court to render Bonnie & Co. liable for costs and attorneys' fees incurred by BTC in attempting to obtain possession of the Treasury Bill from UCT. (Answer ¶¶ 53–55.) BTC alleges that it incurred these costs and fees as a result of Boerer's aforementioned wrongful direction to UCT not to release to Treasury Bill to BTC. *Id.* ¶ 54. Plaintiffs deny these claims. (Answer to Counterclaim ¶¶ 24–26.)

In response to BTC's allegations, this Court has scrutinized the parties' submissions for evidence of plaintiffs' alleged misconduct. This Court's efforts, however, were in vain. BTC has presented no proof beyond its own "information and belief" that Boerer instructed UCT not to release the Treasury Bill. (Answer ¶ 50.) Not surprisingly, plaintiffs' papers were similarly devoid of evidence regarding this issue.

To reiterate, if the non-moving party does not respond to a motion for summary judgment by "set[ting] forth specific facts showing that there is a genuine issue for trial," then "summary judgment, if appropriate, shall be entered against the adverse party." Fed.R.Civ.P. 56(e) Such an entry of summary judgment is. inappropriate, however, "[w]here the evidentiary matter in support of the motion does not establish the absence of a genuine issue, .... even if no opposing evidentiary matter is presented." Fed. R.Civ.P. 56(e) advisory committee's note (1963 amendment). In the instant case, the parties' respective failures to provide this Court any evidence, either in support of or in opposition to, BTC's allegations regarding Boerer's instructions to UCT prevent this Court from entering summary judgment in favor of defendant on this issue. Accordingly, this Court finds that defendant is not entitled to summary judgment on its Eleventh Affirmative Defense/Seventh Counterclaim.

## IV. OTHER MATTERS

Having resolved defendant's motion for summary judgment, plaintiffs' Rule 56(f) request, and plaintiffs' motion for an order granting leave to file additional affidavits in further opposition to BTC's motion for summary judgment, three additional matters remain before this Court: (1) whether plaintiffs are entitled to a jury trial; (2) plaintiffs' request to take the second deposition of a non-party witness; and (3) defendant's motion for a protective order staying discovery. For the reasons herein stated, plaintiffs are not entitled to a jury trial and their motion to take a second deposition should be denied. Finally, defendant's motion for a protective order should be dismissed as moot.

### A. Plaintiffs' Jury Demand

Plaintiffs styled their Complaint as a "Complaint and Jury Demand." *See* (Notice of Motion at Exh. 1.) However, Section 10.2 of the Factoring Agreement provides that plaintiffs "waive all rights to a trial by jury in the event of litigation with respect to any matter connected with this Agreement . . . or any other transaction between [plaintiffs and BTC]." *Id.* at Exh. B. The Limited Guaranty contains a similar provision. *Id.* at Exh. H. Accordingly, defendant seeks to have this Court "strike the jury demand, as the plaintiffs have explicitly waived their right to a jury in the documents they sue upon." (Prizzi Aff. ¶ 3.) Plaintiffs "do not contest the request by BT[C] to strike the demand for a jury trial made by [their] former counsel." (Boerer Aff. ¶ 3(b).) Because the unambiguous language of both the Factoring Agreement and the Limited Guaranty clearly waive plaintiffs' right to a jury trial, and because plaintiffs concede that they have waived their right to a jury trial, this Court finds that plaintiffs' jury demand should be stricken.

### B. Plaintiffs' Motion to Compel a Second Deposition

Plaintiffs also seek leave from this Court to take a second deposition of Nikki Cifarelli ("Cifarelli"), a former Vice President of Bonnie & Co. (Memorandum in Support of Plaintiffs' Motion for Leave to Take the Deposition of Nikki Cifarelli, *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 91 Civ. 0341 ("Memo for Leave") at 1.) Cifarelli's first deposition occurred on August 18, 1994, and lasted approximately four hours. *Id.* Plaintiffs allege that on August 22, 1994, their attorneys received "certain documents and business records of Bonnie & Company from [its] former counsel," including "the original log, presumably kept by Cifarelli, of applications for Letters of Credit made by plaintiffs to [BTC] ... as well as actions taken on each." *Id.* At Cifarelli's first deposition, she admitted that it was her job to oversee the procuring of letters of credit from BTC, but was unable to recall specific details regarding her role in so doing. *Id.* at 2. Plaintiffs maintain that the issuance of these letters of credit is at the "center" of this litigation. *Id.* at 1. They thus seek to depose her a second time, on the grounds that the original log would "more than likely refresh her recollection." *Id.* at 2.

Predictably, BTC opposes subjecting Cifarelli to a second deposition. BTC claims that: (1) plaintiffs bring this motion after serving Cifarelli with a subpoena for a second deposition, in violation of Rule 30(a)(2)(B); (2) Cifarelli already has been "extensively interrogated" on this subject; and (3) that a second deposition would impose "an overwhelming burden" on Cifarelli, her employer, BTC, as well as this Court. (Defendant's Memorandum of Law in Opposition to Plaintiffs' Motion for Leave to Take a Second Deposition of Nikki Cifarelli, *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 91 Civ. 0341 ("Opp.Memo") at 1–2 (Oct. 21, 1994).)

This Court notes that the decision to grant discovery requests lies within its discretion. *See Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 474 (2d Cir.1995); *Hollander v. American Cyanamid Co.*, 895 F.2d 80, 84 (2d Cir.1990). "Like most discovery disputes, the availability of a second deposition is left to the discretion of the trial court." *Tramm v. Porter Mem. Hosp.*, 128 F.R.D. 666, 668 (N.D.Ind.1989). Rule 30(a)(2)(B) governs courts' resolutions of motions to take more than one deposition. As amended in 1993, Rule 30(a)(2)(B) provides that:

> A party *must* obtain leave of court, which shall be granted to the extent consistent with the principles stated in Rule 26(b)(2) ... if, without the written stipulation of the parties, the person to be examined already has been deposed in the case[.]

Fed.R.Civ.P. 30(a)(2)(B) (emphasis added).

This Court's research has located just one decision, *Christy v. Pennsylvania Turnpike Comm'n*, 160 F.R.D. 51 (E.D.Pa.1995), in which a court has been similarly confronted with a party who sought to re-depose a witness without first seeking leave of the court pursuant to amended Rule 30(a)(2)(B). In *Christy*, after plaintiff Christy had been deposed once, he amended his complaint and "added several new parties and allegations." *Christy*, 160 F.R.D. at 52. The defendants then attempted to re-depose Christy without seeking leave of court. *Id.* The court, finding that Christy had offered no argument against his re-deposition other than defendant's violation of Rule 30(a)(2)(B), permitted defendants to re-depose Christy. *Id.* However, because in a second deposition there is "no logical reason why [the deposing party] should duplicate the same material covered at the first deposition", the *Christy* court held that Christy's re-deposition "shall be limited to areas not covered in the first deposition." *Id.* at 52–53 (citations omitted).

This Court finds that *Christy* is distinct from the instant case. First, in *Christy* it was the plaintiff whose second deposition was sought. In the instant case, Cifarelli is a non-party with no stake in the outcome of the litigation. Second, and more importantly, the *Christy* defendants sought Christy's re-deposition because he had amended his complaint to introduce new parties and allegations. The defendants therefore sought— and were required by the court only to seek—testimony concerning the new parties and issues. In the instant case, Cifarelli has already given a complete deposition concern-

ing her involvement in obtaining letters of credit from BTC. The only justification plaintiffs offer for seeking Cifarelli's re-deposition is to attempt to refresh her memory about this issue. (Plaintiffs' Memo at 2.) Because Cifarelli is a non-party witness and plaintiffs intend simply to re-hash old testimony, this Court finds that plaintiffs' motion for leave to take the second deposition of Cifarelli should be denied.

### C. BTC's Motion for a Protective Order

In the final motion pending before this Court, defendant BTC moves for a protective order under Rule 26(c) to stay discovery. (Memorandum in Support of Defendant's Motion For a Protective Order, *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 91 Civ. 0341 ("Dft.Memo") at 1 (Feb 28, 1995).) Following the submission of BTC's motion for summary judgment on all claims and counterclaims in this litigation, this Court "So Ordered" a Stipulation between the parties temporarily staying all discovery and related procedural issues. (Stipulation, *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 91 Civ. 0341 (July 5, 1994)); (Dft.Memo at 4–6.) That stipulation, however, has since expired. (Dft.Memo at 5.) BTC currently seeks an extension of the stay.

This Court finds that BTC's motion should be denied as moot. Because the Court has resolved the summary judgment motion in the instant Opinion & Order, there is no longer reason to stay discovery. This Court finds that, within thirty days of the filing of this Opinion & Order, the parties should jointly submit a proposed Scheduling Order for this Court's approval setting forth: (1) the proposed scope of discovery; (2) the proposed topics of discovery; (3) the proposed sources or individuals from whom each party seeks its discovery; (4) the proposed timing of such discovery; and (5) the proposed cut-off date of discovery. This Court further finds that the parties should submit a Joint Pre–Trial Order for this Court's approval no later than thirty days following the conclusion of discovery.

### CONCLUSION

IT IS HEREBY ORDERED THAT plaintiffs' Rule 56(f) request is DENIED.

IT IS FURTHER ORDERED THAT plaintiffs' motion for leave to file additional affidavits is DENIED.

IT IS FURTHER ORDERED THAT defendant's motion for summary judgment on Count One is DENIED as to plaintiffs' claim of breach of the Factoring Agreement and GRANTED as to plaintiffs' claim for punitive damages.

IT IS FURTHER ORDERED THAT defendant's motion for summary judgment on Count Two is GRANTED.

IT IS FURTHER ORDERED THAT defendant's motion for summary judgment on Count Three is GRANTED.

IT IS FURTHER ORDERED THAT defendant's motion for summary judgment on Count Four is: (1) DENIED as to plaintiffs' claims for the release of the $1,000,000 Treasury Bill; (2) DENIED as to plaintiffs' claim for compensatory damages for defendant's allegedly wrongful failure to release the $1,000,000 Treasury Bill; and (3) GRANTED as to plaintiffs' claim for punitive damages for defendant's allegedly wrongful failure to release the $1,000,000 Treasury Bill.

IT IS FURTHER ORDERED THAT defendant's motion for summary judgment on Count Five is: (1) DENIED as to plaintiffs' claim of breach of the Factoring Agreement; (2) GRANTED as to plaintiffs' claim for breach of fiduciary duty; (3) GRANTED as to plaintiffs' claim of negligence; (4) GRANTED as to plaintiffs' claim of fraud; (5) GRANTED as to plaintiffs' claim of breach of duty of confidentiality; (6) GRANTED as to plaintiffs' claim of mental anguish and emotional distress; (7) DENIED as to plaintiffs' claim for damages for lost profits and salary; and (8) GRANTED on plaintiffs' claim for damages for mental anguish and emotional distress for breach of contract.

IT IS FURTHER ORDERED THAT defendant's motion for summary judgment on Count Six is: (1) DENIED on plaintiffs' request for costs and attorneys' fees arising from defendant's alleged breach of contract in Count One; and (2) GRANTED on plain-

tiffs' request for costs and attorneys' fees arising from defendant's alleged breach of fiduciary duty in Count Two.

IT IS FURTHER ORDERED THAT defendant's Affirmative Defenses One through Four are DENIED.

IT IS FURTHER ORDERED THAT summary judgment on defendant's Fifth Affirmative Defense/First Counterclaim is DENIED.

IT IS FURTHER ORDERED THAT summary judgment on defendant's Sixth Affirmative Defense/Second Counterclaim is GRANTED.

IT IS FURTHER ORDERED THAT summary judgment on defendant's Seventh Affirmative Defense/Third Counterclaim is DENIED.

IT IS FURTHER ORDERED THAT summary judgment on defendant's Eighth Affirmative Defense/Fourth Counterclaim is GRANTED.

IT IS FURTHER ORDERED THAT summary judgment on defendant's Ninth Affirmative Defense/Fifth Counterclaim is DENIED.

IT IS FURTHER ORDERED THAT summary judgment on defendant's Tenth Affirmative Defense/Sixth Counterclaim is DENIED.

IT IS FURTHER ORDERED THAT summary judgment on defendant's Eleventh Affirmative Defense/Seventh Counterclaim is DENIED.

IT IS FURTHER ORDERED THAT plaintiffs' request for a jury trial is STRICKEN.

IT IS FURTHER ORDERED THAT plaintiffs' motion to compel a second deposition is DENIED.

IT IS FURTHER ORDERED THAT defendant's motion for a protective order is DISMISSED.

IT IS FURTHER ORDERED THAT within thirty days of the filing of this Opinion & Order, the parties jointly submit a proposed Scheduling Order for this Court's approval setting forth: (1) the proposed scope of discovery; (2) the proposed topics of discovery; (3) the proposed sources or individuals from whom each party seeks its discovery; (4) the proposed timing of such discovery; and (5) the proposed cut-off date of discovery.

IT IS FURTHER ORDERED THAT the parties submit a Joint Pre–Trial Order for this Court's approval no later than thirty days following the conclusion of discovery.

SO ORDERED.